Jones, Chief Judge,
delivered the opinion of the court:
This is a suit for the recovery of taxes in the amount of $11,632.04[1] paid by plaintiff, J. C. Pitman & Sons, Inc., on behalf of another corporation.
Plaintiff is a New Hampshire corporation engaged in the manufacture and sale of restaurant equipment. It is the successor company to a Massachusetts corporation of the same name. In 1945, John C. Pitman, plaintiff’s majority stockholder, acquired the exclusive right to purchase all products manufactured by plaintiff for a specified period. He subsequently formed the J. C. Pitman & Sons Sales Corporation and transferred to it the exclusive sales franchise. Although that corporation bore almost the same name as plaintiff, it was not in a parent-subsidiary relationship with that corporation. However, the stockholders, officers, and directors of the two corporations were the same, among whom was C. Carroll Cunningham, general counsel and trustee of voting trusts of all the stock in both companies.
Among Cunningham’s diverse powers and responsibilities was the duty to attend to tax matters affecting either or both of the companies. It was for that reason that he undertook the responsibility for attending to a tax deficiency notice mailed to the sales corporation from the Commissioner of Internal Bevenue on June 25, 1951, relating to taxes assessed against that company for the years 1945, 1946, and 1947. Certain deficiencies had also been assessed against the plaintiff corporation for roughly the same period.
*703 For reasons best known to Mr. Cunningham, but apparently to protect his own interests, he informed the directors of plaintiff company that to the extent that the sales corporation did not have sufficient funds to defray its tax deficiencies, it would be necessary for plaintiff to pay them. He further informed the directors that this arrangement was binding upon them as a result of an agreement which he had reached with the Internal Revenue Service relating to the tax liabilities of both corporations. There is no substantial evidence, however, that any such understanding had in fact been reached.
Since the sales corporation had ceased to do business in 1950 (but with formal liquidation postponed pending the settlement of tax questions), it did not have the funds available with which to discharge these obligations. Thus plaintiff, responding to Mr. Cunningham’s representation, paid the amounts which it now seeks to recover, and advised the Internal Revenue Service that such payments were for the benefit of the sales corporation.
Plaintiff contends that it discharged the tax liabilities of the sales corporation under the mistake of fact that an agreement had been made with the Internal Revenue Service that legally obligated plaintiff to make payment. This mistake, plaintiff says, was induced by the fraud of its attorneys. Plaintiff avers that the disputed sums were accepted by agents of the Government with knowledge of the circumstances under which they were paid. In making these allegations plaintiff is founding its case on the provisions of Title 28 United States Code, giving this court jurisdiction to render judgment on any claim arising from an “implied contract with the United States.” [2]
Defendant, on the other hand, argues that the petition alleges a contract implied in law, over which this court has no jurisdiction; but should it appear that the court does have jurisdiction in the instant case, then plaintiff’s petition must be denied because any payment made by plaintiff was voluntary in so far as the United States is concerned.
*704 The defendant also takes the position that this action is barred because it is essentially one for the refund of taxes within the meaning of section 7422(a) of the Internal Revenue Code of 1954 and because the petition was not filed in a timely fashion.[3]
It is manifest that if this case is a suit for a tax refund it is barred by plaintiff’s failure to file a timely claim for refund. Plaintiff therefore grounds its entire case on the claim of an implied contract. The plaintiff’s brief and a considerable portion of defendant’s brief are devoted to this issue. In these circumstances we have no choice but to discuss it, since the other issue is practically conceded.
As we understand defendant’s position, it is that if plaintiff is not acting as a volunteer in paying these taxes (and plaintiff claims that it is not) then plaintiff must of necessity be a taxpayer wbo must seek his relief by claiming a refund under section 7422(a). This very question of whether plaintiff was a volunteer lies at the heart of this case regardless of whether the action is given a label of “tax refund” or “contract.” Since plaintiff has chosen the ground on which to proceed, we will consider the case in terms of the allegations ; thus, the question is whether the petition, fairly construed, sets forth that kind of a contract for which this court will grant relief, and, if so, whether the record before us justifies such relief in this case.
At the outset, we are faced with a technical dichotomy between contracts implied in fact and contracts implied in law. It has been said that this court has no jurisdiction to l-ender judgment in the latter.[4] Under the traditional conception, *705 a contract implied in fact is a real contract in the usual sense, although there may have been no actual worded “agreement.” It is drawn out by the trier of fact when the circumstances warrant him to conclude (particularly from the conduct of the parties) that there exists the legal equivalent of mutual consent. In other words, a contract implied in fact is a promise implied by the law. By way of contrast, a contract implied in law is an obligation imposed by the law. As stated by Lord Mansfield:
If the defendant be under an obligation, from the ties of natural justice, to refund; the law implies a debt, and gives this action founded in the equity of the plaintiff’s case, as it were upon a contract. [Moses v. Macferlan, 2 Burr. 1005, 97 Eng. Rep. 676 (K. B. 1760).]
The “ties of natural justice” of which he spoke do not, however, impose an obligation for the protection of a mere volunteer.[5] As Lord Mansfield saw it, a contract implied in law is neither contract nor tort, but a third category entirely different in nature.
In the instant case it would be quite simple to be enticed, by certain language dredged from the record, into relegating the case into one category of implied contract or the other, depending upon whether the language were suggested by plaintiff or defendant. To do so, however, would be to permit ourselves to jump to the conclusion while being drawn away from the clear facts of the case. Clearing away the verbiage, it is apparent that the success of plaintiff’s claim rests on its ability to bring the case within the scope of one of two groups of cases in which this court has granted relief upon an implied contract.
*706 Typical of the first group[6] relied upon by plaintiff is United States v. State Bank, 96 U.S. 30 (1877). In that case the cashier of a United States Subtreasury in Boston engaged in a fraud upon the plaintiff to conceal the fact that he had embezzled a large amount of Federal money. The Supreme Court held that where the money of an innocent person is received by the United States by means of a fraud to which its agent was a party, such money cannot be held against the claim of the wronged party. The fraud of the agent was the essential element because it was that fraud which constituted such duress upon the money of the plaintiff as to render his payments involuntary. A second type of case in which this court has taken jurisdiction is illustrated by Kirkendall v. United States, 90 Ct. Cl. 606 (1940),[7] where the Government illegally seized the plaintiff’s money and applied it to the tax liability of another. In that instance the element of seizure by the Government supplied the necessary amount of property duress to take the case out of the general rule. The court said:
When the Government has illegally received money which is the property of an innocent citizen * * *, there arises an implied contract on the part of the Government to make restitution * * * and this court has jurisdiction to entertain the suit. [Kirkendall v. United States, 90 Ct. Cl. at 613.] [Emphasis added.]
These typical cases show that in each instance in which relief has been granted there has been present some element which would remove the payee from the fatal category of pure volunteer. The record before us, however, is void of any fact that would supply us with such an element.
Plaintiff insists that the Internal Bevenue Service was on notice[8] that plaintiff paid the tax liabilities of the sales cor *707 poration under a mistaken conception of its duty. This assertion is made on the strength of Mr. Cunningham’s transmittal letters, accompanying the plaintiff’s payment checks, which stated that the checks were in payment of the sales corporation’s liability. We have examined these letters and checks carefully and find nothing therein that would be sufficient to put defendant on notice that plaintiff was not making a volunteer payment, especially in view of the other facts in evidence. For that reason we cannot possibly equate this case to those upon which plaintiff relies. To do so would place an impossible burden upon the routines of the Internal Revenue Service, for we have the impression that the payment of one’s taxes by another is not an unusual occurrence.
To hold the defendant liable for the alleged fraud or misconduct of an attorney of the opposite party in the selection of which it had no part, would necessitate a much stronger factual showing of full notice or knowledge on the part of the Government, or participation on the part of an agent of the Government, or some other special circumstances not evident here.
Admittedly, the plaintiff is upon the horns of a dilemma, but we cannot remove it. Had it sought relief under the tax refund statutes, it would have been barred by its failure to file a claim and by the passage of time. On the other hand, by taking the position that it is not a taxpayer within the meaning of those laws, it, by failing to show notice, does not carry its burden of establishing an implied contract.
The petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Roald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a New Hampshire corporation, engaged in the manufacture and sale of restaurant equipment, with its principal place of business at Concord, New Hampshire. By a reorganization on July 31, 1956, plaintiff is the successor corporation to a Massachusetts corporation of the same name, organized in 1932. Plaintiff and its predecessor are hereinafter referred to as the plaintiff.
*708 2. In February 1945, John C. Pitman, the majority stockholder in plaintiff, acquired at no cost the exclusive right to purchase all products manufactured by plaintiff during the period March 1,1945 through February 28,1950.
3. Thereafter, on February 28,1945, J. C. Pitman & Sons Sales Corporation was organized as a Massachusetts corporation. John C. Pitman transferred to the sales corporation the exclusive sales franchise in return for which he received all of the stock of that corporation.
4. Although J. C. Pitman & Sons Sales Corporation was not in a parent-subsidiary relationship with plaintiff, the stockholders, officers and directors of the two corporations were the same. The sales corporation ceased doing business in 1950.
5. From December 3, 1948 to May 12, 1956, plaintiff had 300 shares of common stock issued and outstanding. One hundred and seventy-seven (177) shares were owned by John C. Pitman, and after his death on August 29, 1951, by his estate. The remaining 123 shares were held by John C. Pit-man as trustee of a voting trust which he had established for the benefit of his children.
6. Upon the death of John C. Pitman on August 29,1951, C. Carroll Cunningham became successor trustee of this voting trust, having been named as such in the trust documents, and was also appointed special administrator of the estate of John C. Pitman. When such administration was closed on November 18, 1952, Mr. Cunningham became trustee of a testamentary trust established under the will of John C. Pit-man for the benefit of his children. The corpus of this latter trust included the 177 shares of plaintiff’s stock, formerly owned by John C. Pitman.
From the death of John C. Pitman until May 12,1956, Mr. Cunningham exercised control over all of the plaintiff’s stock, being subject only to the restrictions contained in the will and voting trust agreements that he would vote the shares of stock in one unit in the best interests of the company, that Douglas H. Pitman, Donald B,. Pitman and Delbert M. Pitman (sons of John C. Pitman) would be elected officers and directors of the corporation so long as they worked for the best interests thereof, that he would cause dividends to be paid to the *709 beneficiaries, that he would consult with and obtain the opinions of the beneficiaries concerning corporate matters usually presented in meetings of stockholders, and that he would not sell plaintiff’s stock without the consent in writing of the beneficiaries. One of the purposes of the trust was stated to be to eliminate as far as possible futuro clashes of stock interests in connection with the operation of the company, by placing the final decision of all controversies in a disinterested third person.
7. Prior to his death, John C. Pitman had also distributed minority interests of stock in the sales corporation (see findings 3 and 4) subject to a voting trust identical in terms with that concerning plaintiff’s stock. John C. Pitman was trustee of this voting trust, and Mr. Cunningham was the successor trustee. As such, and as special administrator and then testamentary trustee, Mr. Cunningham had control of all of the stock in the sales corporation from the death of John C. Pitman until May 12,1956, subject only to the same restrictions as stated in connection with his control of plaintiff’s stock.
8. Mr. Cunningham was an attorney at law and member of a Boston law firm, Greenhood and Cunningham.
On October 28,1944, John C. Pitman had by written agreement retained this law firm to represent him and plaintiff in connection with the alleged conspiracy on the part of other “members and associates” of the company to gain control of and defraud plaintiff. This agreement provided that if Greenhood and Cunningham were successful in regaining Mr. Pitman’s former standing in plaintiff, or if they accomplished their proposed plan to divest “the conspirators” of the control and ownership of plaintiff and vest the same in Mr. Pitman, then the law firm would be paid one-third of the “net benefits” accruing to John C. Pitman or plaintiff for a 6-year period, whether in the form of increased salary or dividends for Mr. Pitman, or gross profits or recoveries for plaintiff, applicable to Mr. Pitman’s capital stock. This agreement was executed by Mr. Pitman in his own behalf and purportedly in behalf of plaintiff.
9. During the period from 1945 through 1947, plaintiff paid to Greenhood and Cunningham $118,123.06 pursuant *710 to the 1944 fee agreement, and some additional payments were made by John C. Pitman, individually. One of the items included in the “net benefits” on which these fees were computed was the sales franchise which plaintiff granted to John C. Pitman and which was transferred by him to the sales corporation in 1945 in exchange for the stock in the sales corporation. Based on an evaluation of the franchise at $100,000, Greenhood and Cunningham claimed and were paid a fee of approximately $33,000 thereon.
10. No further fees were claimed by or paid to Greenhood and Cunningham under the 1944 fee agreement until after the death of John C. Pitman in 1951. After his death, Green-hood and Cunningham presented an additional claim to plaintiff for $98,012.92, which claim was based on an asserted increase in the net worth of plaintiff during the 6-year period of the fee agreement. Plaintiff paid this claim in full while Mr. Cunningham was in control of all of the stock of plaintiff.
11. On June 25,1951, the Commissioner of Internal Revenue sent to the sales corporation a formal notice of income and excess profits tax deficiencies for the year March 1,1945, to December 31, 1945, and income tax deficiencies for the years 1946 and 1947. On September 13,1951, the sales corporation filed a petition with the Tax Court of the United States (Docket No. 36720) seeking a redetermination of its tax liability for the aforementioned years. On the same date, plaintiff filed a petition with the Tax Court (Docket No. 36721) seeking a redetermination of its tax liability for the years 1945 through 1947. One of the issues contested with respect to the tax liability of the sales corporation was the allowability of certain deductions claimed for amortization of the sales franchise contributed to the capital of the sales corporation.
Greenhood and Cunningham served as general counsel for plaintiff and the sales corporation, but never advised the other officers and directors of either corporation of the filing or disposition of the Tax Court cases, although such officers and directors knew that the tax returns for the above-mentioned years were in dispute with the Internal Revenue Service.
*711 12. On November 5, 1953, plaintiff and the sales corporation acknowledged tbeir liability for the tax deficiencies which were the subject of the Tax Court petitions and executed stipulations as to the additional taxes and interest due.
13. Beginning in 1946, the directors of plaintiff were John C. Pitman, majority stockholder, C. Carroll Cunningham and E. Eussell Greenhood, members of the Greenhood and Cunningham law firm, and Douglas Pitman, Donald Pitman, Arthur Pitman and Delbert Pitman. The latter four were sons of John C. Pitman. In 1948 Arthur Pitman left the board, and in 1951, John C. Pitman died. The same individuals described above comprised the board of directors of the sales corporation. This membership continued, with the changes described, until 1955, with the exception that in May 1952, James Garnis, a veteran employee, became a director of plaintiff.
Beginning in 1946, the officers of plaintiff were John C. Pitman, president and treasurer; Arthur Pitman and Delbert Pitman, vice-presidents; Douglas Pitman and Donald Pit-man, assistant treasurers. The officers of the sales corporation were the same as those of plaintiff until liquidation of the sales corporation. When such liquidation occurred is not shown in evidence, although the sales corporation ceased doing business in November 1950, with formal liquidation postponed until disposition of pending questions of tax liability. After John C. Pitman’s death in 1951, and until 1955, the officers of plaintiff were Delbert Pitman, president; Donald Pitman, vice-president and assistant treasurer; and Douglas Pitman, treasurer.
14. Delbert Pitman and James Garnis were informed by Mr. Cunningham of certain tax liabilities of plaintiff and the sales corporation. They were further informed by Mr. Cunningham that to the extent the sales corporation did not have sufficient funds, it was necessary for the plaintiff to pay the tax liability of the sales corporation, and that such arrangement was part of the agreement reached by him with the Internal Eevenue Service concerning the tax liability of the two corporations.
There is no substantial evidence that any such understanding had been reached with the Internal Eevenue Service. *712 Mr. Cunningham was duly authorized by both corporations to represent the corporations with respect to their tax liabilities, this authority having existed prior to the death of John C. Pitman and thereafter during Mr. Cunningham’s control of the stock of such corporations.
15. On January 1, 1954, plaintiff owed the sales corporation $24,886.75. In addition to this account receivable the sales corporation had an account in the Essex Trust Company, Lynn, Massachusetts, which, on March 3, 1954, amounted to at least $10,400.67. The evidence does not disclose what additional funds, if any, were in this account on that date, or what additional assets, if any, the sales corporation had at that time. However, there were not sufficient funds held by the sales corporation to pay its tax liabilities when they were paid as hereinafter related.
16. On February 18,1954, pursuant to the stipulation filed with the Tax Court, additional taxes and interest were assessed against the sales corporation, and paid on the dates hereinafter shown, as follows:
Item Year Tax Amount Date Paid
1945 Income Tax_ $555.61 3- 4-54
1945 Interest. 258.14 3- 4-54
1945 Excess Profits Tax.. 9,845.06 3- 4-54
1945 Interest_ 4,574.03 3- 4-54
1946 Income Tax_ 9,051.25 4-13-54
1946 Interest_ 3,662.15 4-13-54
1947 Income Tax_ 6,073.83 5-12-54
1947 Interest_ 2,093.05 5-12-54
1947 Additional Interest.. 105.82 6-23-54
Further additional taxes, not the subject of the Tax Court case, and interest and penalties thereon, were assessed against the sales corporation, with dates of payment as follows:
Item Year Tax Amount Date Paid
10.. 1948 Income Tax-$4,659.34 4-21-54
11.. 1948 Interest_ 1,416.18 4-21-54
12.. 1948 Penalty_ 1,164.83 4-21-54
13.. 1949 Income Tax-2,250.36 4-21-54
14.. 1949 Interest.. 761.21 4-21-54
15.. 1949 Penalty. 596.63 4-21-54
17.The tax items set forth in finding 16 were paid by various checks drawn either by plaintiff or by the sales corporation pursuant to instructions of Mr. Cunningham, as hereinafter set forth in this finding.
*713 Two of the checks, covering items 1 and 3 above, were drawn by the sales corporation on its funds, with its treasurer, Donald B. Pitman, signing for and on behalf of that corporation. All of the other checks, covering all of the other above-enumerated items, were drawn by plaintiff on its funds, with its assistant treasurer, Donald E. Pitman, signing the checks for and on behalf of plaintiff except as to items 5 and 6 on which plaintiff’s other assistant treasurer, James Garnis, drew the check for and on behalf of plaintiff.
The payments made by plaintiff on the above-mentioned tax liabilities of the sales corporation totaled $22,034.78 for the items covering the principal of tax deficiencies. In accordance with the instructions of Mr. Cunningham, plaintiff charged these payments on its books to reduce its account payable of $24,886.76 due the sales corporation, leaving a balance of $2,851.98.
The payments made by plaintiff on the above-mentioned tax liabilities of the sales corporation totaled $14,632.04 for the items covering deficiency interest and penalties. In accordance with the instructions of Mr. Cunningham, these payments were charged to an interest expense account on plaintiff’s books and were not charged against the amount due the sales corporation.
The total payments made by the sales corporation on its above-mentioned tax liabilities amounted to $10,400.67, not charged in any way on plaintiff’s books.
Mr. Cunningham transmitted all of the above-mentioned checks of the plaintiff and the sales corporation to the Internal Eevenue Service, and his transmittal letters stated that each was in payment of a certain one or more of the above-mentioned tax liabilities of the sales corporation. The corporate officer who made each check knew it was drawn to pay tax liabilities of the sales corporation.
These transmittal letters, with respect to items 7 through 15, expressly stated that plaintiff’s checks were presented in payment of the particular tax liabilities of the sales corporation, but not with respect to items 2, 4, 5, and 6, although plaintiff’s checks clearly showed by whom they were drawn.
18. On February 24,1954, the balance due Greenhood and Cunningham, as shown on plaintiff’s books, on account of *714 plaintiff’s obligations to this law firm under the contract referred to in finding 8, was the sum of $28,512.92, being the unpaid part of the $98,012.92 claim referred to in finding 10.
This balance of $28,512.92 was not further reduced until December 1954, but thereafter in three installments plaintiff by June 1955 completed payment of this account.
19. Plaintiff claimed a tax deduction on its 1954 income tax return for the interest and penalty payments made on behalf of the sales corporation. In 1957, in the course of an audit of the plaintiff’s 1954 income tax return, the examining agent disallowed the deduction taken with respect to these payments of interest and penalties on the grounds that plaintiff had no legal obligation to pay them. This determination was ultimately agreed to by the plaintiff, and the deficiencies assessed as a result of this disallowance were paid.
20. After the sales corporation had made the tax payments of $10,400.67, as related in finding 17, it had a bank balance of about $1,200, and this sum and its claim against plaintiff for $2,851.98, as stated in finding 17, were distributed to the executors of the estate of John C. Pitman, deceased, who, in turn, paid them oyer to plaintiff in partial settlement of an advance previously made by plaintiff to the executors.
21. Plaintiff has never filed a claim for refund of the tax deficiencies assessed and paid as stated in finding 19, nor as to any of the sums it paid in 1954 on the above-enumerated tax liabilities of the sales corporation.
CONCLUSION or LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and its petition is therefore dismissed.

 Plaintiff's original petition demanded judgment in the amount of $14,526.22 but this amount was increased by amendment on July 12, 1961. Subsequently however, plaintiff conceded to an adjustment of $4,050 and reduced its demand to $10,582.04.

 28 U.S.C. § 1491 (1958). Consistent therewith, plaintiff claims the 6-year limitations period provided for by § 2501 of that title.

 “§ 7422. Civil actions for refund.
“(a) No suit prior to filing claim for refund.
“No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary or his delegate, according to the provisions of law in that regard, and the regulations of the Secretary or his delegate established in pursuance thereof.” [26 U.S.C. § 7422(a) (1958)]
With regard to filing, section. 3772(a)(2) of the 1939 Code governs the time in which proceedings under section 7422 must be brought.

 In Merritt v. United States, 267 U.S. 338, 341 (1925), the Supreme Court said:
“The Tucker Act does not give a right of action against the united States in *705 those cases where, if the transaction were between private parties, recovery could be had upon a contract implied in law.”
Por similar comments, see, e.g., United States v. Algoma Lumber Co., 305 U.S. 415 (1939); United States v. Minnesota Mutual Investment Co., 271 U.S. 212 (1920); Sutton v. United States, 256 U.S. 575 (1921); Tempel v. United States, 248 U.S. 121 (1918); Langford v. United States, 101 U.S. 341 (1879). There have been cases, however, where the language is broad enough to imply that the Court of Claims has restitutionary powers. See, e.g., Kirkendall V. United States, 90 Ct. Cl. 606 (1940). But see further reference to that case, infra.

 See, e.g., Combined Industries, Inc. v. United States, 83 Ct. Cl. 613 (1936). See also United States v. Edmondston, 181 U.S. 500, 515 (1901) where the Court summed up as follows: ‘‘It is a case of a voluntary payment, and as such the claimant’s remedy is by appeal to the discretion of Congress and not by an action in the Court of Claims.” Similar language is found in Stahmann v. Vidal, 305 U.S. 61 (1938), at 64.

 See e.g., Maffia v. United States, 143 Ct. Cl. 198 (1958); Gooch Milling <& Elevator Co. v. Commissioner, 133 F. 2d 131 (8th Cir. 1943).

 See also Tucker v. United States, 95 Ct. Cl. 415 (1942); Royal Indemnity Co. v. Board of Education, 137 P. Supp. 890 (M.D.N.C. 1956).

 For the Implication oí this assertion, plaintiff calls our attention to restatement, restitution, § 14(1), comment c (1958) :
“If the mistake * * * is a material one as to his * * * duty to the transferee * * *, the transferor is entitled to restitution if, but only if, the transferee had notice that the transferor so believed, that such belief was not in accordance with the facts, and that the transfer was made because of it. * * *”