**John L. ELIEL, Thomas R. Eliel, and Gregory W. Eliel, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 451–88 C.

United States Claims Court.

Oct. 25, 1989.

Gregory R. Schwandt, Great Falls, Mont., for plaintiffs.

Donald E. Kinner, Washington, D.C., with whom was Acting Asst. Atty. Gen. Stuart Schiffer, for defendant.

## OPINION

RADER, Judge.

Plaintiffs, John, Gregory, and Thomas Eliel, borrowed over $1 million in principal and interest from the Farmers Home Administration (FmHA) to finance their beef ranch in Montana. The ranch did not produce enough income to support the mounting debt. Therefore, plaintiffs retained a financial advisor, Mr. Martin Connell. Mr. Connell approached county FmHA officials in April 1986 to develop a liquidation and debt repayment plan.

Based on discussions between Mr. Connell and Mr. Phillip Young, an FmHA assistant county supervisor, plaintiffs' attorney drafted three proposed agreements.

These proposals offered to sell the ranch and to release plaintiffs from personal liability for any debts remaining after liquidation. Plaintiffs signed the agreements on May 28, 1986, and delivered the signed copies to Mr. Young. Mr. Young stated that his county office did not have authority to execute the agreements. FmHA never signed the agreements.

Acting on verbal assurances from Mr. Young, plaintiffs liquidated their operations, though not always in accordance with the terms of the proposed agreements. Later, Mr. Young asked plaintiffs to deed their interest in the ranch to FmHA before the required date under the proposed agreements. He further indicated that a release of liability would require approval from FmHA headquarters in Washington, D.C.

Plaintiffs seek damages in the United States Claims Court under 28 U.S.C. § 1491(a) (1982) for breach of an implied-in-fact contract and an implied covenant of good faith and fair dealing. Defendant moves for summary judgment pursuant to RUSCC 56. Defendant denies existence of an implied-in-fact contract and counterclaims for the amount of plaintiffs' debt to FmHA.

This court cannot rule on defendant's motion, but instead dismisses plaintiffs' complaint for lack of jurisdiction. Plaintiffs fail to allege sufficient facts to establish jurisdiction in the Claims Court. Consequently, this court does not reach defendant's summary judgment motion and must dismiss defendant's counterclaim.

## FACTS[1]

Plaintiffs are ranchers from Montana. Plaintiffs owned two ranch properties—the "Big Hole Valley" and the "Stoddard Prop-

erty." Plaintiffs mortgaged Big Hole Valley to FmHA and the John Hancock Company. Plaintiffs purchased the Stoddard Property on a contract for deed without a mortgage to FmHA. All three plaintiffs executed loan agreements with FmHA from 1984 through 1986 totalling over $1 million in principal and interest to finance their ranching operations.

Beginning in January 1986, plaintiffs did not make scheduled payments on their loans. Plaintiffs hired Mr. Connell, a financial advisor, to help them manage their debt.

On April 8, 1986, Mr. Connell met with Mr. Young to discuss the possibility of liquidating plaintiffs' operations. From notes of this April 8 meeting, plaintiffs' attorney, Mr. Cecil Jones, prepared three proposed liquidation agreements that plaintiffs signed on May 28, 1986.

The proposed agreement signed by John Eliel provided for the sale of the Eliel ranch for $800,000.00. If John Eliel sold the ranch before January 2, 1987, the proposed agreement provided that FmHA would waive its right to a deficiency judgment and would release John Eliel from personal liability. If John Eliel could not sell the ranch by January 2, the proposal allowed FmHA either: (1) to pay off the John Hancock mortgage on Big Hole Valley and repossess the ranch, except for the ranch house, or (2) to release John Eliel from personal liability and leave him to deal with the mortgagor.

The proposed agreements signed by Thomas and Gregory Eliel would have required them to sell their cattle and apply the proceeds to their debt. In addition, they would have conveyed their farm equipment to FmHA. In exchange, FmHA would have released Thomas and Gregory

---

**1.** In evaluating its jurisdiction, this court construes the facts in a light most favorable to plaintiffs. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The court may examine documents outside of the pleadings to ascertain the basis for jurisdiction:

> Every defense, in law or fact, to a claim for relief in any pleading ... shall be asserted in the responsive pleading thereto if one is required, except that *the following defenses may*

> at the option of the pleader *be made by motion:* (1) *lack of jurisdiction over the subject matter.... If a pleading sets forth a claim for relief to which the adverse party is not required to serve a responsive pleading, he may assert* at the trial *any defense in* law or *fact* to that claim for relief.

RUSCC 12(b) (emphasis added). *See Pinkston v. United States,* 6 Cl.Ct. 263, 265 (1984).

from personal liability on any remaining debt.

On or about May 28, 1986, plaintiffs delivered the proposed agreements to FmHA. Mr. Young discussed them with Mr. Anthony Smerker, supervisor of the FmHA county office in Dillon, Montana. Both officials determined that they did not have authority to execute the agreements. FmHA never signed the agreements.

On May 29, 1986, Mr. Jones met with Mr. Young to discuss the proposed liquidation agreements. Mr. Young advised plaintiffs' attorney that FmHA favored liquidation as proposed in the agreements over other debt retirement options. Mr. Young informed Mr. Jones that the plaintiffs were delinquent on their FmHA loan payments. Therefore, FmHA sent documents to plaintiffs outlining various debt servicing options.[2] Mr. Young also asked Mr. Jones to work with Mr. Connell in assisting the plaintiffs to select an option for servicing their debt.

On June 2, 1986, Mr. Connell spoke with Mr. Young about the three proposed liquidation agreements. Mr. Young advised Mr. Connell to assist plaintiffs in reviewing the FmHA debt servicing option forms.

Mr. Young said that the FmHA forms allowed plaintiffs to opt for liquidation.

Mr. Young stated during the June 2 conversation that his office did not have authority to release plaintiffs from liability. According to plaintiffs, Mr. Young also stated that approval from the appropriate FmHA authorities in Washington, D.C. would be a mere formality. Then, plaintiffs contend, Mr. Young advised plaintiffs to proceed as if the agreement was in effect.[3]

As Mr. Young promised, plaintiffs received a notice of delinquency and an accompanying packet outlining various options for servicing their debt. FmHA asked plaintiffs to select an option within 30 days after receipt of the delinquency notice. After plaintiffs returned the completed forms, FmHA would decide whether to grant plaintiffs' request for a particular servicing option. Plaintiffs returned the forms and checked the box indicating a desire to liquidate security for cash. Beside the "security for cash" box on the form, plaintiffs typed "as per agreed to in attached agreement." Defendant's Brief, filed Apr. 3, 1989, Appendix, at 25, 79, 158 (Def. App.).

2. The debt servicing option form is part of a packet that FmHA sends to debtors who are delinquent on their loan repayment obligations. *See* Defendant's Brief, filed Apr. 3, 1989, Appendix, at 25, 79, 158 (Def. App.). FmHA attaches the debt servicing option form to a "Notice of Intent to Take Adverse Action," which informs debtors that they must "work out a satisfactory solution" to their credit problems "through the various servicing options available." Def. App., at 25, 79, 158.

The debt servicing option form provides debtors with a variety of alternatives, including deferral, restructuring, reamortization, appeal of FmHA's intended adverse action, or liquidation. Debtors request a debt servicing option subject to FmHA review and approval:

If you wish to apply for any of the servicing options you must complete Paragraph I of the enclosed Form ... sign the form, and return the form.... We will then arrange a conference with you to develop financial statements and farm operating plans which FmHA will use to make a determination on your request for servicing options....
*Id.*

The form is strictly a device to obtain information on the debtor's intentions:

This information is to be collected by the FmHA from the borrower in order to learn whether the borrower wants to apply for specific loan servicing options, to appeal FmHA's intended actions, or to cure the default or to liquidate. The information is required so that FmHA understands what actions the borrower wishes to pursue.
*Id.* at 27, 81, 160.

3. Plaintiffs characterized the June 2 discussion between Mr. Young and Mr. Connell as follows:

What grew out of the May 29, 1986 meeting was Mr. Young's telephone call to Marty Connell on June 2, 1986 in which Mr. Connell was informed that the Eliels' agreement would have to be sent to Washington, D.C. for approval. Mr. Young was told by Mr. Connell to do what he had to do to consummate the debt settlement. Mr. Young then advised that he could consummate the transaction himself since approval from Washington, D.C. would be a mere formality and he did not want to go through the hassle. Eliels would receive a release of liability upon completion of the liquidation of the security.
Plaintiff's Statement of Genuine Issues, filed June 13, 1989, at ¶ 7.

Later, plaintiffs listed their ranch property for sale. In August 1986, plaintiffs received an offer for their cattle. Plaintiffs communicated this offer to FmHA, but FmHA did not approve the sale on the grounds that the offer was below market value.

On August 26, 1986, FmHA and Gregory Eliel signed an agreement authorizing plaintiffs to sell farm equipment secured by FmHA. Plaintiffs sold their farm equipment at a public auction supervised by FmHA and liquidated their cattle at a subsequent auction. Plaintiffs tendered the proceeds from the equipment and cattle auctions to FmHA on November 26, 1986.

On November 19, 1986, Mr. Young and Mr. Connell discussed plaintiffs' progress in liquidating their operations. Mr. Young stated that the FmHA Administrator in Washington, D.C. would have to release plaintiffs from liability. He also advised plaintiffs that such a release probably would not occur for five to seven years unless plaintiffs made a cash or compromise offer to FmHA.

The Government did not release plaintiffs from liability on January 2, 1987, as provided under the proposed agreements. On March 5, 1987, plaintiffs' attorney sent a letter to the state FmHA office requesting the release. Plaintiffs' attorney also offered FmHA additional property in exchange for a release from liability.

On March 30, 1987, Kenneth Tonn of the state FmHA office in Montana responded that FmHA could not accept the proposed agreements. Mr. Tonn also stated that plaintiffs' new offer was unacceptable, but made a counteroffer subject to the approval of FmHA Administrator in Washington, D.C. Plaintiffs accepted the counteroffer. On January 25, 1988, the Administrator rejected the counteroffer. The Administrator instead required either repossession of all security or monetary compensation for the entire debt.

At that point, plaintiffs filed this suit. In this action, plaintiffs contend: (1) defendant breached an express or implied contract, (2) defendant should be estopped from denying a contractual relationship which provided benefits for defendant, and (3) defendant breached an implied covenant of good faith, fair dealing, and honesty. Plaintiffs seek $5 million in damages for the property losses sustained by relying on FmHA's representations.

Defendant denies that it entered into any contract with plaintiffs and denies that it acted negligently or fraudulently. Defendant also counterclaims for the outstanding indebtedness of plaintiffs.

## DISCUSSION

Defendant moves for summary judgment. Without filing a jurisdictional motion, defendant also suggests that this court lacks jurisdiction over plaintiffs' complaint because the allegations made by plaintiffs raise an implied-in-law contract claim and sound in tort. Defendant's Brief, filed Apr. 3, 1989, at 13–15.

In response to defendant's motion, plaintiffs principally address jurisdictional questions. Plaintiffs argue that the allegations made in support of an implied covenant of good faith and fair dealing are within the court's subject matter jurisdiction because the tortious acts alleged in the complaint are directly linked to the breach of contract claim. Plaintiffs also contend that they did not raise an implied-in-law contract claim in their complaint, as defendant suggests, but instead based their allegations on an implied-in-fact contract and on the doctrine of equitable estoppel.

This court must first dispose of any jurisdictional issues:

> Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy.

*Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1945). Defendant's failure to move to dismiss for lack of jurisdiction does not preclude the court from independently raising and resolving the issue. RUSCC 12(h)(3).

## Jurisdiction

■ The Tucker Act defines the jurisdictional boundaries of the United States Claims Court:

The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (1982). The court may not entertain claims outside the specific jurisdictional authority conferred by Congress. *Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 271, 1 L.Ed.2d 306 (1956); *Tree Farm Dev. Corp. v. United States,* 218 Ct.Cl. 308, 316, 585 F.2d 493, 498 (1978). Consequently, the court may not decide claims that sound in tort. *Somali Dev. Bank v. United States*, 205 Ct.Cl. 741, 743, 508 F.2d 817, 820 (1974). Tort claims include negligent misrepresentation, wrongful inducement, or careless performance of a duty. *Somali,* 508 F.2d at 821. Furthermore, this court cannot adjudicate claims based on contracts implied in law. *Tree Farm,* 585 F.2d at 498.

To establish jurisdiction, plaintiffs must allege a body of facts which arguably would show an express or implied contract with the Government:

If sustained, these factual allegations would arguably show an actual contract between the plaintiff ... and defendant; the court therefore has jurisdiction to decide the issue.

*Ralston Steel Corp. v. United States,* 169 Ct.Cl. 119, 137, 340 F.2d 663, 668, *cert. denied,* 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723 (1965). Conversely, if plaintiffs failed to allege facts relating to each element of their contract claim or alleged facts negating one of the elements, then this court would decline jurisdiction. *See Truckee–Carson Irrigation Dist. v. United States,* 14 Cl.Ct. 361, 370–71 (1988).

## Express or Implied Contract

The Tucker Act grants the Claims Court jurisdiction to adjudicate "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). In the case at bar, FmHA did not sign the purported May 28 agreement. Therefore, no express contract arose.

To establish jurisdiction, plaintiff must allege sufficient facts to show arguably an implied contract. The requirements for an implied-in-fact contract are the same as for an express contract; only the nature of the evidence differs. *Russell Corp. v. United States*, 210 Ct.Cl. 596, 609, 537 F.2d 474, 482 (1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977); *see also Fincke v. United States*, 230 Ct.Cl. 233, 244, 675 F.2d 289, 295 (1982); *Algonac Mfg. Co. v. United States*, 192 Ct.Cl. 649, 673–74, 428 F.2d 1241, 1255 (1970).

■ To prove existence of an implied-in-fact contract, plaintiffs must show mutuality of intent, an unambiguous offer, unconditional acceptance, and consideration. *Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed.Cir.1984); *Russell Corp.,* 537 F.2d at 482; *Somali,* 508 F.2d at 822. Thus, plaintiffs must show that the parties intended to be bound and expressed their intentions in an understandable manner. *Russell Corp.,* 537 F.2d at 482.

■ Plaintiffs also must show that the Government officials who allegedly consummated the agreement had authority to bind the Government. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Russell Corp.,* 537 F.2d at 481–82. Consequently, anyone who enters into a contract with the Government assumes the risk of accurately determining whether Government agents acted within their authority. *Federal Crop Ins.,* 332 U.S. at 384, 68 S.Ct. at 3.

Actual authority is frequently in dispute where a plaintiff must establish implied acceptance of an offer to prove the existence of an implied-in-fact contract. Oral assurances by a Government official do not establish an implied-in-fact contract unless

the parties complete all steps required by agency regulations:

> Oral assurances do not produce a contract implied-in-fact until all the steps have been taken that the agency procedure requires; until then, there is no intent to be bound. Thus, it is irrelevant if the oral assurances emanate from the very official who will have authority at the proper time, to sign the contract or grant. *Empresas Electronics Walser, Inc. v. United States*, 650 F.2d 286, 223 Ct.Cl. 686, 688 *cert. denied*, 449 U.S. 953 [101 S.Ct. 357, 66 L.Ed.2d 217] (1980). Where an approving official exceeds his authority, the government can disavow the official's words and is not bound by an implied contract. *Id.*

*New Am. Shipbuilders v. United States*, 871 F.2d 1077 (Fed.Cir.1989).

The United States Court of Appeals for the Federal Circuit recently found, however, that this court may imply actual authority when the officer authorized to act on behalf of the Government empowers another official to act in his stead. *H. Landau & Co. v. United States*, 886 F.2d 322 (Fed.Cir.1989). In *Landau*, the Federal Circuit held that regional Small Business Administration (SBA) officers had authority to guarantee payments to a subcontractor where the contracting officer (CO) designated regional officers as countersignatories to a disbursement account. The Federal Circuit disregarded internal SBA operating procedures requiring the CO to review any requested disbursements. Thus, this court may, under narrow circumstances, imply an actual authority.

Unlike an express contract, which "speaks for itself and leaves no place for implications," plaintiffs may establish an implied-in-fact contract through inferences drawn from surrounding circumstances or the conduct of the parties. *Klebe v. United States*, 263 U.S. 188, 192, 44 S.Ct. 58, 59, 68 L.Ed. 244 (1923). *See also, Baltimore & Ohio R.R. v. United States*, 261 U.S. 592, 597, 43 S.Ct. 425, 426, 67 L.Ed. 816 (1922). Although circumstantial, proof of an implied-in-fact contract must nevertheless unambiguously show each element of an express contract. *New Am. Shipbuilders*, 871 F.2d at 1077. Mere statements of opinion or predictions do not establish that the parties created or intended to create a binding agreement. *National By-Products v. United States*, 186 Ct.Cl. 546, 559, 405 F.2d 1256, 1264 (1969).

■ Plaintiffs fail to allege a body of facts that, if sustained by this court, arguably would show an implied-in-fact contract with the Government. Plaintiffs did not present allegations tending to show mutuality of intent, unconditional acceptance by the defendant, or authority.

*Lack of Mutual Intent*

Plaintiffs did not show a mutuality of intent. Neither party intended to be bound by the terms of the May 28 agreements. Though plaintiffs allege that Mr. Young agreed to work as if the FmHA Administrator in Washington, D.C. had approved the agreements, the bulk of his statements and conduct indicates otherwise. For instance, plaintiffs admit that Mr. Young repeatedly informed them of the need for approval from Washington, D.C. and that a release of liability probably would not occur for five to seven years unless plaintiffs made a cash or compromise offer to FmHA. This assertion conflicted with the proposed agreements which called for release of liability upon liquidation.

Furthermore, when plaintiffs inquired about liquidation on November 19, 1986, Mr. Young indicated that plaintiffs could obtain a release of liability by deeding the interest in the Eliel ranches to FmHA. Again, Mr. Young's statement conflicted with the proposed agreements. Under the proposal, FmHA could not take an interest in the ranches by deed unless plaintiffs failed to sell the property by January 2, 1987.

The parties also did not reach a meeting of the minds on many specific features of the proposed agreements. Plaintiffs believed, for example, that FmHA would release their secured crops upon collection of all the liquidation proceeds. FmHA, however, planned to release only an amount for

living and operating expenses and to collect anything in excess of that amount.

Both parties failed to follow the terms of the proposed agreements on at least one occasion by entering into contradictory contracts and negotiations. The May 28 agreements required plaintiffs to submit farm equipment to FmHA. Yet, the parties ultimately executed an agreement on August 26, 1986, allowing Thomas and Gregory Eliel to sell their farm equipment via a public auction. The August contract contradicted the proposed agreements of May 28. The August contract did not purport to modify the proposed agreements of May 28.

In sum, the May 28 draft was a proposal and nothing more. Although the parties apparently discussed the broad outlines of a liquidation plan, they did not agree to the specific terms.

*Lack of Acceptance*

FmHA did not unconditionally accept plaintiffs' May 28 offer. On or about May 28, 1986, Mr. Young received the three proposed agreements. He did not endorse or otherwise accept the proposal. FmHA did not accept any offer at that time. Rather, Mr. Young stated that his office did not have authority to release plaintiffs from liability and advised plaintiffs' attorney and financial advisor to assist plaintiffs in completing the debt servicing option forms. These forms were the next step in FmHA's procedure for dealing with delinquency.

Plaintiffs completed and returned the forms. Plaintiffs elected to liquidate their assets. On the forms, plaintiffs checked the option stating "sell my (our) security for cash." To these forms, plaintiffs attached the May 28 proposal.

The debt servicing option forms were a request for information, not an offer for a contract. By their terms, the forms solicited information from plaintiffs rather than indicating acceptance of an offer or proposal of a counteroffer. By electing liquidation and attaching their May 28 proposal, plaintiffs requested FmHA to accept that option.

Once again, FmHA did not endorse or otherwise accept the May 28 proposal attached to the debt servicing option forms. Instead, as stated on the forms, FmHA began negotiations with plaintiffs to accomplish liquidation, the Eliels' selected option. These negotiations and other conduct of both parties departed from the terms of the May 28 offer.

*Lack of Actual Authority*

Plaintiffs' allegations also show that FmHA officials who allegedly consummated the May 28 proposed agreements lacked actual authority to bind the Government. Federal regulations permit only the FmHA Administrator in Washington, D.C. to release debtors from personal liability where outstanding indebtedness after conveyance or sale of secured property exceeds $25,000.00:

> *Acceptance of offer and release from liability.* Before accepting an offer to convey chattels to FmHA, the concurrence of the State Director must be obtained. When chattel security is voluntarily conveyed to the Government and the borrower and cosigner(s), if any, are to be released from liability, the servicing official will stamp the note(s) ... "Satisfied by Surrender of Security and Borrower Released from Liability". The servicing official is authorized to sign the release of liability statement except when the FmHA debt secured by the chattels less their market value exceeds $25,000, the release of liability statement must be signed by the Administrator.

7 C.F.R. § 1955.20(b)(2) (1986). *See also,* 7 C.F.R. §§ 1955.10(f)(2), 1962.34(d) (1986).

Local FmHA officials repeatedly advised plaintiffs that the Administrator alone had authority to execute the proposed agreements and release plaintiffs from personal liability. Plaintiffs concede in their complaint that Mr. Young explained that only Washington, D.C. could approve the May 28 proposals. Plaintiffs' Amended Complaint, filed Feb. 6, 1989, at ¶ 25 (Complaint).

In his June 2 letter summarizing the meeting, Mr. Connell reiterated: "Regarding the three agreements that were sub-

mitted ... in order for them to be signed they have to be sent to the national office in Washington D.C." Affidavit of Martin R. Connell, filed June 13, 1989, at Exhibit A. Mr. Connell also admitted in his November 19 letter, appended to plaintiffs' complaint, that Mr. Young informed him: "[B]ecause the loan writeoff is larger than $25,000, it would have to go to Washington, D.C. for approval." Complaint, at Exhibit F. Consequently, plaintiffs knew throughout the liquidation process that the Administrator had not released them from liability. Plaintiffs knew the Administrator had not signed the May 28 offer.

■ Plaintiffs nevertheless allege that county FmHA officials promised to treat the agreements as if signed. These allegations, which this court accepts as accurate for the purpose of ascertaining jurisdiction, do not create an implied contract under the Tucker Act. Oral assurances and predictions do not establish an intent to be bound in the absence of compliance with applicable federal regulations. According to federal regulations, only the Administrator could bind FmHA to a release of liability in excess of $25,000.00.[4]

Plaintiffs do not allege that the Administrator ever approved the May 28 proposal. Furthermore, the Federal Circuit's recent decision in *Landau* accepting proof of implied actual authority does not apply. Plaintiffs' complaint is devoid of facts that tend to show that the Administrator authorized county FmHA officials to execute the agreement in his stead. In fact, plaintiffs concede that FmHA officials with whom they negotiated lacked authority to bind the Government and never received approval from Washington, D.C.

In sum, plaintiffs' allegations, if sustained by this court, would not show unconditional acceptance on the part of the Government or mutuality of intent. Rather, plaintiffs' allegations tend to show that the parties did not intend to be bound by the May 28 proposed agreements. Plain-

tiffs and defendant did not have a meeting of the minds as to the exact plan of liquidation or the plaintiffs' release from liability. Furthermore, plaintiffs' allegations and exhibits concede the lack of actual authority on the part of county FmHA officials to bind the Government. Thus, plaintiffs' allegations regarding the existence of an express or implied-in-fact contract are not sufficient to establish jurisdiction.

### Implied-in-Law Contract versus Equitable Estoppel

The Claims Court has no jurisdiction over claims based on contracts implied in law:

> The Tucker Act does not give a right of action against the United States in those cases where, if the transaction were between private parties, recovery could be had upon a contract implied in law.

*Merritt v. United States,* 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925). *See also, J.C. Pitman & Sons, Inc. v. United States,* 161 Ct.Cl. 701, 317 F.2d 366 (1963).

An implied-in-law contract is a duty imposed by law "to bring about justice" without regard to mutual assent or the intentions of the parties. *Algonac,* 428 F.2d at 1255 (quoting 17 C.J.S. *Contracts* § 4 (1963)). An implied-in-law contract claim is often referred to as promissory estoppel.

In its motion for summary judgment, defendant alleges that plaintiffs' allegations amount to an implied-in-law contract claim. In response, plaintiffs assert that they based their claims on the doctrine of equitable estoppel.

This court and its predecessor, the United States Court of Claims, have often applied the doctrine of equitable estoppel. *Russell Corp.,* 537 F.2d at 484; *Pacific Gas & Elec. v. United States,* 3 Cl.Ct. 329, 340 (1983), *aff'd,* 738 F.2d 452 (Fed.Cir. 1984). Unlike promissory estoppel, which a plaintiff invokes to create a cause of action, equitable estoppel serves the purpose of barring defendant from raising a defense or an objection:

---

4. Where, as in this case, the Government publishes regulations defining the authority of officials, plaintiff is deemed to have had notice that officials lacked contractual authority. *Jascourt*

*v. United States,* 207 Ct.Cl. 955, 956, 521 F.2d 1406 (1975) (Order), *cert. denied,* 423 U.S. 1032, 96 S.Ct. 562, 46 L.Ed.2d 405 (1975).

The difference between the doctrines can best be explained by observing that promissory estoppel is used to create a cause of action, whereas equitable estoppel is used to bar a party from raising a defense or objection it otherwise would have, or from instituting an action which it is entitled to institute. *Promissory estoppel is a sword, and equitable estoppel is a shield.*

*Biagioli v. United States,* 2 Cl.Ct. 304, 307 (1983) (emphasis in original), *quoting Jablon v. United States,* 657 F.2d 1064, 1068 (9th Cir.1981).

The Federal Circuit enunciated four elements of the doctrine of equitable estoppel: (1) defendant knew the facts, (2) defendant intended to induce plaintiffs to act or should have known that its conduct would induce plaintiffs to act, (3) plaintiffs were ignorant of the true facts, and (4) plaintiffs relied on defendant's conduct to their injury. *American Elec. Laboratories v. United States,* 774 F.2d 1110, 1113 (Fed.Cir. 1985); *Pacific Gas,* 3 Cl.Ct. at 340. Plaintiffs cannot use equitable estoppel to "fill the gap resulting from an absence of authority to contract." *Llamera v. United States,* 15 Cl.Ct. 593, 600 (1988); *see also, Hazeltine Corp. v. United States,* 10 Cl.Ct. 417, 440 (1986), *aff'd,* 820 F.2d 1190 (Fed. Cir.1987).

■ In their complaint, plaintiffs allege that FmHA induced them to believe that the proposed agreements were in full force to acquire the benefits of liquidation. Plaintiffs did not allege, however, that county FmHA officers had authority to release them from liability. To the contrary, plaintiffs admit that local FmHA officials had no authority to execute the agreement.

Plaintiffs' complaint, therefore, does not allege the requisite elements of the eq-

uitable estoppel doctrine, but concedes that county FmHA officials lacked the authority to execute or sign the proposed agreements on behalf of the Government. Plaintiffs either seek relief based on promissory estoppel or invoke the doctrine of equitable estoppel to "fill the gap" resulting from a lack of actual authority. In either case, this court may not exercise jurisdiction based on plaintiffs' claims of reliance and unjust enrichment.

*Implied Covenant*

An implied covenant of good faith and fair dealing exists in every contract:

The underlying principle is that there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing.

5 WILLISTON ON CONTRACTS, THIRD EDITION § 670 (1961).

■ Plaintiffs allege in their complaint that the implied covenant arose from the May 28 draft agreements. As previously discussed, however, those proposals did not create a contract. Therefore, there is no contract or agreement on which plaintiffs can base an implied covenant. Consequently, this court must find that it lacks jurisdiction to entertain plaintiffs' implied covenant claim. The allegations on the face of the complaint do not show that there was a contract under which an implied covenant could exist.[5]

*Defendant's Counterclaim*

■ If this court has no jurisdiction over plaintiffs' complaint, it must dismiss defendant's counterclaim along with plaintiffs'

---

5. Apparently realizing that this court could find that the May 28 proposed agreements and subsequent communications did not establish a binding contractual relationship, plaintiffs contend in their brief in response to defendant's motion that the implied covenant of good faith and fair dealing stems from the promissory notes previously executed by the parties.

This court rejects plaintiffs' attempt to link the implied covenant at issue to these promissory notes. The implied covenant raised by plain-

tiffs allegedly requires the Government to act in good faith when liquidating plaintiffs' assets and in deciding whether to release plaintiffs from personal liability. These notes, however, have nothing to do either with the liquidation process or with FmHA's alleged obligation to release plaintiffs from personal liability. Consequently, an implied obligation of good faith relating to such matters cannot plausibly stem from the notes.

claims. *Mulholland v. United States,* 175 Ct.Cl. 832, 846, 361 F.2d 237, 244 (1966).

Plaintiffs do not even arguably show an express or implied-in-fact contract with FmHA. Consequently, plaintiff cannot show breach of an implied covenant of good faith and fair dealing. Furthermore, this court lacks jurisdiction over those portions of plaintiffs' complaint that allege reliance or unjust enrichment because such allegations raise either an inadequate equitable estoppel claim or an implied-in-law contract claim. In the absence of jurisdiction over plaintiffs' complaint, this court must dismiss defendant's counterclaim requesting judgment for the outstanding balance of plaintiffs' indebtedness.

## CONCLUSION

Plaintiffs did not show either an express or implied contract. Plaintiffs did not provide facts showing unconditional acceptance by FmHA and mutual assent. Plaintiffs conceded that county FmHA officials lacked actual authority to accept the proposed May 28 agreements. Plaintiffs did not even arguably satisfy this court's Tucker Act jurisdiction.

In the absence of a contract, this court necessarily must find that it lacks jurisdiction over the implied covenant claim. The court also lacks jurisdiction over the allegations in plaintiffs' complaint regarding reliance on Government representations and unjust enrichment on the part of the Government.[6]

In the absence of an arguable claim under the Tucker Act, this court directs the Clerk to enter judgment dismissing plaintiffs' complaint for lack of jurisdiction. Consequently, this court does not reach defendant's motion for summary judgment and directs the Clerk to enter judgment dismissing defendant's counterclaim.

No costs.

---

**6.** The Ninth Circuit, however, has determined that district courts may have jurisdiction over related claims. *Love v. United States,* 871 F.2d 1488 (9th Cir.1989); *contra, LaPlant v. United States,* 872 F.2d 881 (9th Cir.1989).