Clive Charles THOMAS, Petitioner,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

Nos. 91–70750, 92–70142.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 10, 1993.

Submission Withdrawn April 7, 1994.

Resubmitted June 24, 1994.

Decided Sept. 2, 1994.

As Amended on Denial of Rehearing
Nov. 23, 1994.*

* Kozinski, Circuit Judge, would grant the petition for rehearing.

Cindy M. Cipriani, Gray, Cary, Ware & Freidenrich, San Diego, CA, for petitioner.

Donald A. Couvillon, Office of Immigration Litigation, U.S. Dept. of Justice, Washington, DC, for respondent.

Before: KOZINSKI, SILER,** and KLEINFELD, Circuit Judges.

Opinion by Judge KLEINFELD; Dissent by Judge KOZINSKI.

KLEINFELD, Circuit Judge:

The main issue in this case arises from breach of a cooperation agreement. Thomas, a criminal, traded information to the United States Attorney for a promise that "the government" would not oppose his application

** Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by

designation.

for discretionary relief from deportation. The government nevertheless did oppose his application. The Immigration and Naturalization Service argues that it was not bound by the United States Attorney's promise. We hold that the INS was bound. The promise expressly bound the government for the particular conduct, and the United States Attorney had actual authority to bind the government. The case also requires remand for reconsideration of the motion to reopen under *Butros v. INS*, 990 F.2d 1142 (9th Cir.1993).

## I. Facts

Thomas was brought to the United States and admitted as a lawful permanent resident as a child in 1954. Three decades later, still not a citizen, he was a narcotics dealer. In 1983 he pleaded guilty to conspiracy to possess cocaine for sale, and was sentenced to seven years imprisonment. At the government's urging, he was released from prison after about two years because of his cooperation in a major narcotics investigation.

Thomas and an Assistant United States Attorney entered into a cooperation agreement that consisted of a formal "letter of agreement" on the letterhead of the "United States Attorney—Mountain States Drug Task Force." It was signed by Thomas, two DEA agents, a Narcotics Task Force Agent, and the Assistant United States Attorney on behalf of the United States Attorney. Basically, Thomas promised to give the government a sworn statement about his narcotics trafficking, and work as a cooperating witness for two years. In return, the government agreed to advise the Parole Commission of his cooperation, and promised not to oppose motions made by Thomas's attorney for reduction of sentence or relief from deportation. Under the agreement, if the United States Attorney decided that Thomas had lied, the government could terminate the agreement and do nothing it had promised. Before the government terminated, however, Thomas was entitled to confront his accusers and explain himself.[1]

---

1. The relevant portions of the letter agreement read as follows:

   Under the agreement set forth below, the United States of America (hereafter "Government," which term includes its departments, officers, agents and agencies), acting by the Office of the United States Attorney for the District of Colorado, will not prosecute you for existing charges known to the government arising from your involvement in trafficking in controlled substances, nor for potential charges based upon information supplied by you, except as to crimes of violence, if any.

   .    .    .    .    .

   The terms of agreement are as follows:
   1. You shall, after being given a *Miranda* warning, waive your constitutional right to remain silent....
   2. You shall become a cooperating witness for and under the direction of the Government for a period of two (2) years from the date all parties sign this letter of agreement. As a cooperating witness, you shall fully and truthfully disclose all information with respect to the activities of yourself and others concerning all matters about which the Government inquires of you....

   .    .    .    .    .

   4. You, as a cooperating witness, shall make yourself available to the Government for interviews upon request....
   5. You shall at all times give complete, truthful and accurate information and testimony. After the date of this agreement you will not commit any future crimes whatsoever or be found in contempt by any court after proper hearing for any refusal to testify about matters covered by this agreement. If any of the events in the foregoing sentence occur or in the event that it is determined by the Office of the United States Attorney for the District of Colorado that you have given false, incomplete or misleading testimony or information or have otherwise violated any provision of· this agreement, then this agreement may be declared terminated by the Government. In such event, you will first be given an opportunity to confront your accusers and to explain to the Government any suspected or alleged violations of any provision of this agreement, and the Government shall apply a good faith standard in judging your conduct. Thereafter, at the Government's sole option, you may be subject to prosecution for any Federal criminal violation of which the Government has knowledge, including but not limited to perjury, giving a false statement and obstruction of justice. Any such prosecutions may be premised upon testimony or information theretofore provided by you under this agreement, and such information may be used against you and may further be disseminated to other prosecuting authorities.

   .    .    .    .    .

   7. Apart from any breach of this agreement by you as specified above, this agreement is not intended to foreclose any state prosecutorial authority from prosecuting you....
   8. The Government will bring your cooperation to the attention of the United States Parole Commission as it may pertain to the sentence received in Criminal Case No. 83–0560–JLI, Southern District of California. The Government will not oppose any motions made by your counsel for reduction of sentence, modifi-

After his conviction, the INS issued an order to show cause why Thomas should not be deported. Thomas requested discretionary relief under Section 212(c), 8 U.S.C. § 1182(c) (1988). The day before his hearing, Thomas moved for a continuance. He claimed a continuance was warranted because the cooperation agreement was still under seal in district court pending completion of proceedings against other narcotics dealers, and Thomas sought the testimony of individuals regarding the extent and value of his cooperation. The motion for continuance was denied.

The INS opposed Thomas's request for relief from deportation, despite the express promise of "The Government" not to oppose that very motion. At the hearing, the INS called two witnesses who testified to Thomas's bad character and criminal activities. Thomas testified about his reformed attitudes and the extent of his cooperation under the agreement. Although he could not introduce a copy of the cooperation agreement into evidence, the Immigration Judge was made aware that he had cooperated extensively pursuant to an agreement. Thomas lost, appealed, and lost again before the Board of Immigration Appeals (BIA).

While Thomas's appeal was pending before the BIA, his cooperation agreement was unsealed, so his attorney provided the BIA with a copy. The INS attorney, in response, provided the BIA with a letter from a United States Attorney. The United States Attorney urged that the INS was not "completely" bound by the agreement, although he noted the text of the agreement "may suggest that." He also claimed Thomas breached the agreement, which released the government from its obligations.[2]

Thomas subsequently moved to reopen his deportation proceedings because of new equities—marriage, birth of a son, and successful completion of probation. The BIA denied the motion, on the ground that the final deportation order ended his lawful residency, and so ended his eligibility for discretionary relief from deportation.

## II. Analysis

We have jurisdiction to review a decision of the BIA under the Immigration and Nationality Act, 8 U.S.C. § 1105a (1988). We must remand on the motion to reopen because of a change in the law subsequent to the BIA's decision. That does not end the matter, though. Thomas has appealed the BIA decision on his initial appeal, as well as its decision on his motion to reopen. The denial of the motion to reopen, and the motion itself, involve different issues from the

---

cation or relief from deportation to the Court, parole commission and U.S. Immigration Service.

2. The United States Attorney's letter to the INS stated in relevant part,

My first concern is that the letter agreement seems to bind the Immigration and Naturalization Service. Although the letter may suggest that, it was not the intention of the United States Attorney's office for the District of Colorado to completely bind the INS. Our intent was to advise you of the cooperation provided by Mr. Thomas and why that cooperation and details he provided should be a significant factor in your determination of deportation. However, if the letter contract appears to suggest that the U.S. Attorney's office did intend to bind the INS, then that is another matter.

⁂

In January of this year Clive Thomas testified as a witness for the government in the case of United States v. Van Nuys. Based upon my observations of Thomas as the prosecutor in that trial, I must state to you that I do not believe Thomas' [sic] lived up to obligations to the government. Contrary to his grand jury testimony which was detailed and

complete, Thomas' trial testimony was disjointed, inarticulate, hesitating, incomplete, and most unsatisfactory to me. Whether or not Thomas is a good witness for the government would depend upon the quality and the quantity of his truthful testimony. We do not mean to suggest that he color his testimony, or slant his testimony in some manner inappropriately beneficial to the government. But compared to Clive Thomas' grand jury testimony and to debriefings of him by DEA agents, I found his testimony at trial to be in many respects unacceptable and untruthful.

⁂

In view of all of the above, it is my position that Clive Thomas has not upheld his side of the immunity agreement with the government, thereby affecting the obligation by the government to support Thomas against an order of deportation. Because Clive Thomas has not abided by the conditions of his agreement in the contract, I feel at this point the Government is not bound regarding our favorable position for him against deportation.

The trial of United States v. Van Nuys ended in a hung jury.

BIA decision on Thomas's appeal of the Immigration Judge's order denying him Section 212(c) relief. We therefore must address the petition for review of the appeal to the BIA. Even if the BIA decides that the new equities asserted in the motion are insufficient to change the result, the government's breach of its agreement requires that Thomas's Section 212(c) proceeding be conducted again, unopposed by the government.

#### A. Denial of the Motion to Reopen.

█ The BIA denied the motion to reopen on a ground which later became invalid in this circuit. It relied on our decision in *Gonzales v. INS*, 921 F.2d 236 (9th Cir.1990), for the proposition that once the Immigration Judge's order of deportation was upheld by the BIA, the deportee was ineligible for Section 212(c) relief. But our subsequent en banc decision, *Butros v. INS*, 990 F.2d 1142, 1144 (9th Cir.1993), holds to the contrary. Because Thomas has not actually departed from the United States, the statute and regulation thereunder do not bar his motion to reopen. *Id.* We must therefore remand to the BIA so it can consider Thomas's motion to reopen.

#### B. The Cooperation Agreement.

█ Thomas argues that the government violated the agreement pursuant to which he waived his constitutional right to silence and provided the government with information and testimony. He claims that this violation breached his constitutional right to due process of law. We review de novo. *Barraza Rivera v. INS*, 913 F.2d 1443, 1448 (9th Cir.1990). We reverse, with directions that Thomas have a new proceeding in which the government does not oppose his motion for 212(c) relief.

█ It has long been the law that the government's failure to keep a commitment which induces a guilty plea requires that judgment be vacated and the case remanded. *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 498–99, 30 L.Ed.2d 427 (1971). A cooperation agreement is analogous to a plea agreement. *United States v. Carrillo*, 709 F.2d 35, 36 (9th Cir.1983). The government is held to the literal terms of the agreement, and ordinarily must bear responsibility for any lack of clarity. *United States v.*

*Anderson*, 970 F.2d 602, 607 (9th Cir.1992). Enforcement of the agreement requires that the person making the promise be authorized, and that the promisee rely on the promise to his detriment. *Johnson v. Lumpkin*, 769 F.2d 630, 633 (9th Cir.1985).

The INS argues that "the Service was not a party to the agreement, nor is it bound by the agreement, nor does the agreement specify that INS would not oppose the alien's request." The INS correctly points out that the record does not show the INS was ever consulted about whether the government should make the agreement, or even advised that the agreement existed. The INS also argues that the United States Attorney lacked authority to enter into an agreement on its behalf.

We sympathize with the INS's concern that it may be bound by an agreement made without its participation, and that a deportation order may be vacated because of an agreement of which the INS was not informed. The INS did not knowingly do anything unfair to Thomas, so far as the record shows. The INS trial attorney may be justifiably annoyed at spending considerable time and effort opposing a motion for relief from deportation, only to have the effort wasted if the United States Attorney promised that the motion would not be opposed and did not advise the INS of the promise. Any unfairness to the Service apparently results from the failure of the United States Attorney to keep the INS informed.

Nevertheless, Thomas was entitled to performance by the government of its promise. "The staff lawyers in a prosecutor's office have the burden of 'letting the left hand know what the right hand is doing' or has done. That the breach of the agreement was inadvertent does not lessen its impact." *Santobello*, 404 U.S. at 262, 92 S.Ct. at 499. The United States Attorney should have written to whomever in the Department of Justice would be responsible for seeing that the promise he made on the government's behalf would be performed by the INS. The BIA should have reversed and remanded for a new hearing in which the government would not oppose Thomas's motion for relief from deportation.

█ The agreement plainly and unambiguously spoke to the issue of deportation and expressly bound the INS. In the first paragraph, the agreement says that "Govern-

ment," designated as the promisor, "includes its departments, officers, agents, and agencies." *See supra* note 1 (setting forth text of agreement). The eighth paragraph bound "[t]he Government," so defined, not to oppose motions for "relief from deportation to the ... U.S. Immigration Service." *See supra* note 1. Motions for relief from deportation are made and heard before the INS, and opposed by INS lawyers, so this particular promise, to mean anything, had to mean that the INS would not oppose such a motion. The letter making the promise is on "United States Attorney—Mountain States Drug Task Force" letterhead, with the seal of the Department of Justice on the top. There is no question the agreement purported to bind the INS not to oppose Thomas's application for relief from deportation.

█ The most substantial issue raised by the government is whether the United States Attorney possessed the requisite authority to bind the INS. To analyze an agency issue, we distinguish between actual and apparent authority. Generally, as explained below, apparent authority will not suffice in this context. Then under the rubric of actual authority, we distinguish between express and implied authority. In this case, there was no express authority, so we must determine whether the circumstances of the express authorization implied authority for acts of this kind.

█ The rule requiring compliance by the government with promises made during plea bargaining and analogous contexts generally requires that the agent be authorized to make the promise. *Johnson v. Lumpkin,* 769 F.2d 630, 633 (9th Cir.1985) (federal prosecutor's promise does not bind state authorities) Estoppel and apparent authority normally will not substitute for actual authority to bind the United States government. *Utah Power & Light Co. v. United States,* 243 U.S. 389, 408–09, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917); *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). *But see Houck ex rel. United States v. Folding Carton Admin. Comm.,* 881 F.2d 494, 501 (7th Cir.1989).

█ In the law of agency, actual authority takes two forms: (1) express authori-ty, and (2) authority that is implied or incidental to a grant of express authority. W. Edward Sell, *Sell on Agency* 25–31 (1985). Therefore, the United States Attorney's promise that the government would not oppose Thomas's § 212(c) application is binding on the INS if the United States Attorney had either an express grant of authority to make such a promise, or his authority for making the promise is incidental to some other express grant of authority.

United States Attorneys get their authority directly from Congress, not by delegation from the Attorney General. Congress has conferred express authority on United States Attorneys by law:

> Except as otherwise provided by law, each United States attorney, within his district, shall—
>
> (1) prosecute for all offenses against the United States;
>
> (2) prosecute or defend, for the Government, all civil actions, suits or proceedings in which the United States is concerned;
>
> (3) appear in behalf of the defendants in all civil actions, suits or proceedings pending in his district against collectors, or other officers of the revenue or customs for any act done by them or for the recovery of any money exacted or paid to these officers, and by them paid into the Treasury;
>
> (4) institute and prosecute proceedings for the collection of fines, penalties, and forfeitures incurred for violation of any revenue law, unless satisfied on investigation that justice does not require the proceedings; and
>
> (5) make such reports as the Attorney General may direct.

28 U.S.C. § 547.

█ Congress has charged the Attorney General, not United States Attorneys, with administration and enforcement of the Immigration and Nationality Act. 8 U.S.C. § 1103(a). Within the Immigration and Naturalization Service, the Attorney General and the Commissioner have made various delegations of that authority. *See, e.g., Dodig v. INS,* 9 F.3d 1418, 1419–20 (9th Cir.1993); 8 C.F.R. §§ 100.2(a), 103.1(a). So far as we have found in the Code of Federal Regulations, no delegation of that authority has been made to United States Attorneys.

█ Our dissenting colleague infers from the absence of any express delegation that United States Attorneys have no authority. But this proves too much. We have not been able to find any place in the Code of Federal Regulations where the Attorney General delegates to United States Attorneys her power to prosecute federal crimes. They nevertheless have that power, because Congress assigned it to them independently of any delegation by the Attorney General. The regulations laying out the organization of the Department of Justice conspicuously omit any delegation of authority to United States Attorneys, no doubt because their authority is statutory. This statutory authorization is referred to at the delegation to Assistant and Deputy Assistant Attorneys General of the Attorney General's authority to designate Department attorneys to conduct legal proceedings "which United States attorneys are authorized by law to conduct." 28 C.F.R. § 0.13.

█ Congress expressly assigned overlapping authority to both the Attorney General and to United States Attorneys. It has authorized the Attorney General to conduct "any kind of legal proceeding ... which United States Attorneys are authorized by law to conduct." 28 U.S.C. § 515(a). The reference to authorization "by law" connects this statute assigning authority to the Attorney General, with the statute quoted above, assigning duties directly "by law" to United States Attorneys. A United States Attorney in Denver does indeed exercise authority without the need for delegation from the Attorney General, even though a Deputy or Assistant Attorney General in Washington D.C. exercises it pursuant to a delegation. Congress has spread out power instead of concentrating it all at the center.

█ We have found no express limitation on the United States Attorneys' power to bind the INS. The government argues that "the AUSA had no authority to speak for the INS." But the authorities it cites do not support that proposition. *Doe v. Civiletti*, 635 F.2d 88, 90 (2d Cir.1980), holds that the oral representations of a Strike Force Justice Department attorney and a DEA agent did not commit the Marshals Service with regard to the Witness Protection Program. Their lack of authority was express, under an Attorney General's order that attorneys and others "are not authorized" to make such commitments, which were to be made by "authorized representatives of the U.S. Marshals Service only." *Id.* No comparable order or other express restriction of authority has been shown to us in this case. *United States v. Fitzhugh*, 801 F.2d 1432, 1433 (D.C.Cir.1986), holds that the DEA was not bound by a prosecutor's agreement because the agreement "did not encompass a subsequent DEA registration proceeding," not for any lack of authority.

█ We have found no express grant of authority to United States Attorneys to bind the "government" not to oppose motions for relief from deportation to the INS. We must therefore decide whether their authority to "prosecute for all offenses against the United States," 28 U.S.C. § 547(1) (1988), implies such authority. It does, under ordinary principles of agency law.

█ The authority to "prosecute" implies the power to make plea agreements incidental to prosecution. That is because an agent has actual authority to make contracts incidental to the agency:

> Unless otherwise agreed, authority to make a contract is inferred from authority to conduct a transaction, if the making of such a contract is incidental to the transaction, usually accompanies such a transaction, or is reasonably necessary to accomplish it.

*Restatement (Second) of Agency* § 50 (1958); *see also id.* § 35 (authority to conduct transaction includes authority for incidental acts). The implied authority of an agent to do the things normally incidental to the authorized transaction is actual, not apparent authority. W. Edward Sell, *Sell on Agency* 31 (1985); Harold G. Reuschlein & William A. Gregory, *Agency and Partnership* 37–38 (1975). Apparent authority, which generally will not suffice to bind the government, arises when a principal causes a third party to believe, correctly or not, that the principal has authorized the agent to engage in particular conduct. Implied authority, unlike apparent authority, is intended by the principal, or would be if the principal thought about it, even though instead of being express, it is implied by words, deeds, custom, acquiescence, and other circumstances. "[I]mplied actual authority, like expressed actual authority, will suffice [to hold the government bound by the acts of its agents]." *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed.Cir.

1989). Authority "is generally implied when such authority is considered to be an integral part of the duties assigned to a [g]overnment employee." *Id.* (quotation omitted).

Cooperation agreements subsequent to conviction are less common than plea agreements, but so customary and closely related that no one, so far as we know, has ever raised a question of whether United States Attorneys can make cooperation agreements on behalf of the government. Many criminal cases involve aliens, and the convictions affect deportability, so deportability will commonly be a concern of defense counsel, affecting the terms of the agreement. Federal Defenders of San Diego, *Defending a Federal Criminal Case* § 17.04.03 (1992).

■■■ A United States Attorneys' authority to commit the government not to oppose a motion for relief from deportation as part of a plea bargain is incidental to his statutory authority to prosecute crimes. The implication arises from several factors. First, deportation commonly arises from the context of criminal prosecution. It is likely to be a central issue in many criminal cases involving aliens. Second, the terms of a plea or cooperation agreement will commonly affect deportation. The attorneys will negotiate the offenses of conviction and sentences partly by considering the effects of these determinations on deportation. Third, there is no reason why, in the absence of regulations or orders to the contrary, we should doubt that Congress implied this grant of authority. Both the United States Attorneys and the Immigration and Naturalization Service are within the same Department. United States Attorneys are very high officials. They are appointed by the President and confirmed by the Senate to high positions in which they exercise authority in criminal cases tersely stated as "prosecute" in an independent and broad statutory conferral. 28 U.S.C. §§ 541, 547(1).

The Fourth Circuit, in holding that a United States Attorney in one district could make a promise binding a United States Attorney in another district, adopted a rationale which would compel the same conclusion we reach:

> [T]hough the Government negotiates its plea agreements through the agency of specific United States Attorneys—as necessarily it must—the agreements reached are those of the Government. *It is the Government at large—not just specific United States Attorneys or United States "Districts"—that is bound by plea agreements negotiated by agents of Government. Whenever a United States Attorney negotiates and enters a plea agreement, it is the Government that "agrees" to whatever is agreed to. Of course, the Government may—and quite readily can— "agree" through its agents that only certain agents are to be obligated in particular respects, or that the Government's obligation is limited territorially or temporally, or that the Government's obligation is otherwise qualified. But the mere fact that a particular agent, holding office in a particular district, and for a limited term of office makes the "agreement"—"agrees"— does not impose those limitations. In sum, under that settled circuit law, the proper way for plea agreements to express such limitations is as limitations on the Government's general obligation—a thing quite easily done—and not by technically inaccurate identifications of particular agents or agencies of Government as the contracting party.*

*United States v. Harvey,* 791 F.2d 294, 302–03 (4th Cir.1986) (emphasis added). *Harvey* establishes that the United States government as a whole uses United States Attorneys as its authorized agents to negotiate plea bargains in criminal cases, so their authorized agreements bind the government as a whole.

This case is distinguishable from those where some official of lesser authority over prosecutions than the United States Attorney has purported to bind the United States Attorney, *e.g., United States v. Williams,* 780 F.2d 802 (9th Cir.1986) (VA administrator had no authority to bind United States Attorney); *United States v. Hudson,* 609 F.2d 1326 (9th Cir.1979) (Secret Service agent had no authority to bind United States Attorney). Nor is the case before us analogous to one where the defendant claimed, without factual support in the record, that a federal promise bound state authorities. *Johnson v. Lumpkin,* 769 F.2d 630, 634 (9th Cir.1985).

■■■ Except as otherwise authorized by law, the Attorney General of the United States supervises all litigation to which the United States or an agency thereof is a par-

ty. 28 U.S.C. § 516. The Attorney General also has authority to control and direct all employees of the Immigration and Naturalization Service. 8 U.S.C. § 1103(a). If the Attorney General wished to limit the incidental authority of United States Attorneys in this respect, she could easily do so with a section in the Code of Federal Regulations, but she has not chosen to do that. As a matter of administrative prudence the Department of Justice might wish to have some internal coordinating procedure for agreements by United States Attorneys which affect the Immigration and Naturalization Service. That is an administrative concern of the Attorney General, not the judiciary. It was not incumbent on defense counsel to assure that the United States Attorney was not stepping on any toes in the Immigration and Naturalization Service.

In its petition for rehearing, the INS points out that the Attorney General instructed United States Attorneys that:

> No agreement shall be made by a U.S. Attorney that an individual will not be extradited or deported or that his/her extradition or deportation will be delayed, altered or restricted to certain nations without the prior approval of the Criminal Division in criminal cases and in cases involving extradition, or the Civil Division in civil cases.

United States Attorneys' Manual § 9–73.510 (1984).

The INS concedes that this was not mentioned in the briefs, including the supplemental briefs we requested on the implied authority issue. The INS says that the quoted direction is in the United States Attorneys' Manual, a document not readily available to INS attorneys. We do not know whether this manual is available to people not employed by the Department of Justice. We need not decide what effect language in an unpublished manual might have, because the quoted language does not change the result.

The language implies that a United States Attorney *does* have authority to promise relief from deportation if the agreement is approved by the Criminal Division. The United States Attorney made the agreement.

If he followed his manual, then the agreement was approved, and he acted with express authority.

The record includes no affidavit or other evidence that the United States Attorney acted without approval. If the United States Attorney or his Assistant disobeyed his manual, and did not obtain the prior approval of the Criminal Division, it would have been easy enough for him to file an affidavit saying so. That would have been evidence of the absence of authority.

We are nonplused by our colleague's suggestion that our holding is contrary to long established precedent. Chief Justice Marshall wrote in 1835 that "[h]e who alleges that an officer entrusted with an important duty has violated his instructions, must show it." *DeLassus v. United States,* 34 U.S. (9 Peters) 117, 134 (1835). The reason is that when a government officer makes a grant or concession, his act "carries with it prima facie evidence that it is within his power." *Id.* We recognized this principle (not that the Supreme Court speaking through Chief Justice Marshall needs our recognition) in *United States v. Jones,* 176 F.2d 278, 282 (9th Cir.1949), and *United States v. State of Washington,* 233 F.2d 811, 816 (9th Cir.1956), among other places.

What "prima facie evidence" and "must show it" mean is that the government's plea bargain with Thomas sufficed as prima facie evidence of authority, and the burden of proof was on the government to show that the United States Attorney violated his manual. Now that we know the Criminal Division had to approve such an agreement, the well established rule requires that we presume that before the DEA agents, Narcotics Task Force agent, and Assistant United States Attorney signed the formal agreement, they obtained the necessary Criminal Division approval.

We shall not invent an excuse for the government to break its promise. If they have an excuse, let them prove it.

The second of the *Johnson v. Lumpkin* conditions, reliance by Thomas to his detri-

ment on the promise, has not been put at issue by the government. By explicitly listing non-opposition to a 212(c) motion among the things the government promised, the agreement suggests that the non-opposition was among the things Thomas wanted if he was to assume the sometimes dangerous and unpleasant role of informant and government witness.

While Thomas had the burden of demonstrating his entitlement to section 212(c) relief, as the BIA said, his burden could have been carried much more easily and effectively had the INS lawyer simply said "we do not oppose the application." Instead, the INS lawyer vigorously opposed the application, and put on a devastating case, with two live witnesses. In *Santobello*, the trial judge said "I am not at all influenced by what the District Attorney says," yet the Supreme Court held that the prisoner was entitled to another proceeding at which the government would perform its promise. *Santobello*, 404 U.S. at 259, 263, 92 S.Ct. at 497, 499. *A fortiori*, so is Thomas.

■ The INS argued to the BIA that the agreement was terminated because of Thomas's breach. But the agreement expressly provided that it could not be terminated for this reason without first allowing Thomas to confront his accusers and explain his position. He was not given this opportunity, so the agreement was not effectively terminated. Plainly, the government was disappointed in Thomas's testimony. A criminal's testimony often lacks the persuasive force of plain truth, even when it is true, and often it is hard to know whether it is true. The government bargained for a criminal's testimony, and cannot avoid paying the agreed price because of buyer's remorse.

■ Our dissenting colleague has not found authority to support his instinct that United States Attorneys cannot bind other parts of the Department of Justice in plea agreements, so is forced, as we are, to apply more general propositions of law and to invent a new theory of "interpolated" and "extrapolated" powers without support in the law. *See* dissent at n. 2. The dissent "emphatically disagree[s] with the notion that a

corona of implied authority surrounds every grant of power by the government to its agents." But it must. Such a "corona" accompanies virtually every grant of authority to any agent. If it were necessary to state everything expressly in order to confer authority, then it would be as hard to draft an authorization as it is to write a computer program. Congress, after all, only gave United States Attorneys authority to "prosecute" criminal cases. It did not grant them express authority to bargain about the cases and enter into plea agreements in order to avoid the burden and risk of prosecuting. That authority is implied, not express. The dissent, if it were correct, would compel the conclusion that all federal plea agreements are void for lack of authority, because United States Attorneys have no express authorization to make plea agreements.

The second critical proposition in the dissent is that "there is no precedent for applying common law principles to define the relationship between the government and its agents." That proposition so broadly stated is, of course, erroneous, as the dissent implicitly concedes. The Federal Circuit has applied common law principles for exactly this purpose. It has held that implied authority, unlike apparent authority, is a form of actual authority which binds the government to contracts. *H. Landau & Co. v. United States*, 886 F.2d 322 (Fed.Cir.1989). The Court of Claims routinely examines facts of particular cases to see whether, though not express, implied authority existed. *See, e.g., Howard v. United States*, 31 Fed.Cl. 297, 312 (1994); *Zoubi v. United States*, 25 Cl.Ct. 581, 587–88 (1992).

■ More broadly, the proposition is mistaken because if it is true, it must be false, like the proposition "all statements are false." Stated positively, the dissent's proposition is that "common law principles do not define government agency relationships." But the central term, "agent," is defined only by the common law. It is a common law

term of art. The proposition boils down to saying that the common law does not define something which is defined by the common law. As Justice Jackson explained, we cannot understand the words, even of our federal statutes, without the benefit of the common law:

> Were we bereft of the common law, our federal system would be impotent. This follows from the recognized futility of attempting all-complete statutory codes, and is apparent from the Constitution itself.

*D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 470, 62 S.Ct. 676, 685, 86 L.Ed. 956 (1942) (Jackson, J. concurring).

Of course the dissent is correct that *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), requires one contracting with a government agent to take the risk of having accurately ascertained that the agent has acted within the scope of his authority. In that case, the government crop insurance agent sold the farmers a policy for spring wheat, but the published regulations prohibited coverage for that type of crop, so the farmers could not collect on the insurance. The case says nothing about whether authority must be express rather than implied. The farmers lost in *Merrill* because published regulations prohibited the government agents from selling the insurance they purported to sell. By contrast, no regulation prohibited the United States Attorney from making the promise he made, and nothing about the nature of the particular promise suggested any lack of authority. The dissent's reference to turning "square corners" in dealings with the government alludes to condemnation of sharp practice, but the only evasion of a solemn promise in this case was by the government itself.

The dissent wonders how the Attorney General could limit the authority of United States Attorneys. A case it cites, *Doe v. Civiletti,* 635 F.2d 88 (2d Cir.1980), shows how. The reason that the United States Attorney could not bind the U.S. Marshal Service in that case was that the Attorney General had issued a Department of Justice Order saying "[government] Attorneys are not authorized" to make the relevant representations or promises. *Id.* at 90, n. 3. The Attorney General has "direction" over all litigation to which the United States is a party, 28 U.S.C. § 516, as well as authority to conduct any legal proceeding which United States Attorneys can conduct, 28 U.S.C. § 515. She plainly can direct whether United States Attorneys can promise nonopposition to immigration petitions when they make plea bargains.

Thomas also contends that he was deprived of due process of law because the Immigration Judge denied him a continuance. The reversal and remand on other grounds obviates the need to decide the continuance issue.

The case is REMANDED for proceedings not inconsistent with this opinion.

KOZINSKI, Circuit Judge, dissenting:

"[A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." So the Supreme Court told us half a century ago in *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). In an opinion likely to have extremely serious and far-reaching consequences, the majority today cuts the core out of *Merrill* and lays waste the principle that the government is bound by its agents only if they act within the scope of their authority.

The heart of my disagreement with the majority lies in its astounding conclusion that every Assistant U.S. Attorney in the country—and by inference every other government official as well—has implicit authority to bind the government in a large variety of matters beyond the scope of his express authority. I emphatically disagree with the notion that such a corona of implied authority surrounds every grant of power by the government to its agents. This is so radical, so sweeping a departure from existing law, its full effect is difficult to fathom. One need only consider the vacuum of authority supporting the majority's ruling, the vague and unmanageable scope of the doctrine it announces and the ad hoc manner in which it reaches its ultimate conclusion to realize that something very dangerous is going on here.

A. Having "found no express grant of authority to United States Attorneys to bind the 'government' not to oppose motions for relief from deportation to the INS," the majority relies on "ordinary principles of agency law" to conclude that U.S. Attorneys have *implied* authority to do so. Maj. op. at 1340. But there is no precedent for applying ordinary, common law agency principles to define the relationship between the federal government and its agents. To the contrary: If common law principles applied to the government, we might resolve this case quite readily—the AUSA no doubt had apparent authority to bind the government in immigration matters. *Merrill* firmly rejected this notion, and with it the idea that common law agency principles have anything to say about the scope of a government agent's authority: "[T]he rules of law whereby private insurance companies are rendered liable for the acts of their agents are not bodily applicable to a Government agency ... unless Congress has so provided." *Merrill,* 332 U.S. at 383 n. 1, 68 S.Ct. at 3 n. 1.

I, for one, find it instructive—nay, daunting—that no Supreme Court case utters so much as a whisper about the doctrine of implied authority that is the centerpiece of the majority's analysis. Nor do any of the regional circuits recognize such a doctrine. When coupled with the Supreme Court's oft-repeated pronouncement that "[m]en must turn square corners when they deal with the Government," *Rock Island, Ark. & La. R.R. v. United States,* 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920), this silence speaks very loud indeed.

I do not denigrate the authority of the Federal Circuit, which forged the majority's purported anchor, *H. Landau & Co. v. United States,* 886 F.2d 322 (Fed.Cir.1989). Indeed, the Federal Circuit is one of the most vigilant enforcers of the principle announced in *Merrill.*[1] *See, e.g., New America Shipbuilders, Inc. v. United States,* 871 F.2d

1077, 1080 (Fed.Cir.1989) ("Where an approving official exceeds his authority, the government can disavow the official's words and is not bound by an implied contract."); *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1575 (Fed.Cir.1984) (plaintiff in a contract action with the government must show "that the officer whose conduct [plaintiff] relied upon had actual authority to bind the government in contract"). But Federal Circuit cases arise in a unique context and must be read with caution. *Landau* was a commercial case and the question presented was whether a designation of federal officials to perform certain duties under the terms of a federal procurement contract carried with it the incidental authority to perform other, closely related, duties under the same contract. The Federal Circuit held that the contract might confer such an implicit grant of authority and remanded for findings on that point. *Landau,* 886 F.2d at 324.

I have no quarrel with *Landau,* so far as it goes. Contract administration is a complex and somewhat arcane process, particularly when it involves the federal government; what authority might lurk within the often convoluted terms of federal contracts can be difficult to determine. What is significant in *Landau,* however, is that *someone* within the agency had the express authority to bind the government; the only question was whether that official had delegated the authority to a subordinate. It's a universe apart to say, as the majority does, that a statutory grant of authority from Congress carries with it the implicit power to bind the United States in matters that fall outside the scope of the statute.

To begin to appreciate the difference, one need only note that in *Landau* the Federal Circuit remanded for factual development by the trial court, something that makes perfect sense when trying to assess an individualized delegation of power from a superior to a subordinate in the context of a quasi-com-

---

1. So was its predecessor, the Court of Claims. *See, e.g., McDonnell Douglas Corp. v. United States,* 670 F.2d 156, 159, 229 Ct.Cl. 323 (1982) ("[A]ny deviation from the prescribed wording [of a contractual patent rights clause] was a violation of the regulation and beyond the authority of the contracting officer. Actions taken by that officer beyond his authority are, of course, not binding on the Government."); *Pasa-*

*dena Hosp. Ass'n v. United States,* 618 F.2d 728, 730–31, 223 Ct.Cl. 72 (1980) (refusing to modify *Merrill* to bind the government to a promise made by a subordinate without actual authority); *Fiorentino v. United States,* 607 F.2d 963, 967, 221 Ct.Cl. 545 (1979) ("[T]he law is that the U.S. Government is not bound by pronouncements made in its behalf by persons not having actual authority.").

mercial transaction. In our case, the majority divines the scope of the U.S. Attorney's implicit authority on its own, as it pretty much has to. After all, it's not possible to remand to the BIA for findings of fact as to whether the members of the 89th Congress (who last amended 28 U.S.C. § 547, in 1966) implicitly meant to authorize U.S. Attorneys to meddle in deportation proceedings.

The other cases the majority cites have nothing at all to do with the rationale for its decision. For instance, *United States v. Harvey*, 791 F.2d 294 (4th Cir.1986), holds only that one U.S. Attorney's office may, when acting within its authority, bind another. This is surprising only to those who view the various divisions within the federal government as akin to sibling corporations, in which case it makes sense to ask whether one sibling can bind another. But, when it comes to the federal government, the only relevant question is whether the agent purporting to bind the government is acting within his authority. If he is, all of the government's other agents are bound, wherever they may reside within the government's organizational chart. The matter at issue in *Harvey* was the enforceability of a plea agreement promising that the government would not prosecute a criminal defendant. *Id.* at 296. The AUSA in that case clearly had authority to bind the government (including the prosecutors working in another U.S. Attorney's office) not to *prosecute.* How does this support the majority's theory of implied authority?

B. Even were one to accept the proposition that certain statutory grants of authority carry with them *some* implied additional powers, one would have to construe this doctrine very narrowly indeed, lest it swallow up the rule that government agents may only bind the government to the extent they are actually authorized.[2] Instructive in this regard is the way the doctrine of implied authority has been applied within the Federal Circuit after *Landau*.[3] Even in the highly specialized context where it was originally developed, the doctrine of implied authority has been applied cautiously and narrowly. *See, e.g., California Sand & Gravel, Inc. v. United States*, 22 Cl.Ct. 19, 27–28 (1990) (Tidwell, J.) (refusing to find implied authority and stating "[t]he court may not substitute itself unconditionally for the executive in granting authority to an unauthorized person"), *aff'd*, 937 F.2d 624 (Fed.Cir.1991); *Eliel v. United States*, 18 Cl.Ct. 461, 467–69 (1989) (refusing to find implied authority and noting that the court can only imply authority "under narrow circumstances"), *aff'd*, 909 F.2d 1495 (Fed.Cir.1990). The Claims Court has stressed that "*Landau* and the theory of implied actual authority is of limited application, and was not intended to repeal the long established rule that, when dealing with the government, only government agents with actual authority can make a contract, express or implied." *California Sand & Gravel*, 22 Cl.Ct. at 27. The Claims Court has only twice found that government agents had the implied authority to bind the government.[4] *See Miller Elevator Co. v. United States*, 30 Fed.Cl. 662 (1994) (Yock, J.); *Zoubi v. Unit-*

2. The majority insists that federal agents must have some implied powers, and gives as an example the unquestioned authority of U.S. Attorneys to enter into plea bargains. In so doing, the majority conflates two very different processes: interpolation and extrapolation. Interpolated powers are those that are less than, and therefore included within, a broader grant of authority. Thus, the power to prosecute includes the power not to prosecute, or to prosecute for a lesser offense. Extrapolated powers, by contrast, go beyond those actually granted to the agent and encroach on the authority given other government agents. The majority's common sense argument has no application to a case such as ours, where the doctrine of implied authority is being used to extrapolate one government agent's powers into areas entrusted by law to other agents.

3. Beyond importing broad common law agency principles, *see* maj. op. at 1340 (applying "ordi-

nary principles of agency law"), the majority cites specific sections of the Second Restatement as supporting adoption of the *Landau* analysis. *Id.* (quoting Restatement (Second) of Agency § 50 (1958) and citing Restatement § 35). True enough, these sections of the Restatement announce a rule analogous to the *Landau* doctrine. But *Landau* in no way relies on the common law agency principles of the Second Restatement which the majority so warmly embraces. The majority's claim notwithstanding, *see* maj. op. at 1342–43, I do not concede, implicitly or otherwise, that *Landau* and its progeny have applied common law agency principles to define the relationship between the government and its agents. My guess is that the judges of the Federal Circuit would be horrified to hear their caselaw so characterized.

4. The Claims Court has considered the merits of a claim of implied authority under *Landau* nine

*ed States,* 25 Cl.Ct. 581 (1992). And these two cases fit within a very narrow reading of *Landau.* The court in *Zoubi* found only that a Customs Service official authorized to hire interpreters also had the authority to set their salary. *Zoubi,* 25 Cl.Ct. at 587. The court in *Miller* found that a contracting officer had delegated to a subordinate the power to approve modifications of an elevator maintenance contract. *Miller,* 30 Fed.Cl. at 693–95.

The Claims Court (now the Court of Federal Claims) has applied the *Landau* analysis only once outside the context of these quasi-commercial cases. In *Howard v. United States,* 31 Fed.Cl. 297 (1994), the Claims Court dismissed the claims of two informants who were seeking to enforce a contract for compensation they had made with mid-level officials in the Customs Service. The court considered the actual authority granted customs officers, found that their actual authority might, under *Landau,* logically extend to providing compensation to informants, but nevertheless concluded that the authority to investigate does not imply the authority to enter binding contracts to compensate informants. *Id.* at 314.

Contrast this with the majority's intrepid approach. Applying the doctrine of implied authority for the first time outside the Federal Circuit, my colleagues have no trouble concluding that all AUSAs in the country

have the implied authority to bind the United States in immigration matters. AUSAs now have this authority, the majority says, because: (1) "deportation commonly arises from the context of criminal prosecutions;" (2) "the terms of a plea or cooperation agreement will commonly affect deportation;" and (3) the U.S. Attorney's Office and the INS are within the same department, and U.S. Attorneys are "very high officials," so "there is no reason why ... we should doubt that Congress implied this grant of authority." Maj. op. at 1340–41. The majority comes up with this short list of reasons without any citation of authority, without taking into account any contrary factors, without legal analysis at all. Given the constellation of possible inquiries one might profitably pursue in puzzling out the question of implied authority,[5] the majority's list of three factors, all neatly stacked to point in a single direction, conjures up the image of a result furiously seeking its rationale.

Especially troubling is the vagueness of the majority's analysis. The government and those who deal with it need to know when the government will be bound by the acts of its agents; they shouldn't have to speculate whether two judges of the court of appeals will find some reason to doubt that the government should be bound by a particular official's promise. The majority limits its ruling to those delegations of authority made

---

other times, and in none of those cases did it find implied authority. *See Howard v. United States,* 31 Fed.Cl. 297, 314 (1994) (Customs agents have no implied authority to bind government to promise to compensate informants); *Buffalo Nat'l Bank v. United States,* 26 Cl.Ct. 1436, 1445–46 (1992) (Horn, J.) (citing *Landau* for the proposition that plaintiff must show the agent contracting for the government had *actual* authority); *Godley v. United States,* 26 Cl.Ct. 1075, 1090–91 (1992) (denying the government's motion for summary judgment because there was a genuine issue of fact as to the authority of a representative of a contracting officer to bind the government), *vacated,* 5 F.3d 1473 (Fed.Cir.1993); *California Sand & Gravel,* 22 Cl.Ct. at 27 (finding no authority for an Army Corps of Engineers district chief to modify a licensing contract); *Goolsby v. United States,* 21 Cl.Ct. 629, 632–33 (1990) (Nettesheim, J.) (finding no authority for a government agent to bind FmHA to a contract modification); *Essen Mall Properties v. United States,* 21 Cl.Ct. 430, 444–45 (1990) (Lydon, J.) (finding no authority for a contracting officer's "authorized representative" or a project manager to bind the Postal Service in contract); *Youngstown Steel Equip. Sales, Inc. v. United States,* 20 Cl.Ct. 517, 528 n. 14 (1990) (refusing to imply authority for

a "line attorney" to bind the Economic Development Administration to a contract) (dicta), *rev'd on other grounds,* 935 F.2d 281 (Fed.Cir.1991); *H. Landau & Co. v. United States,* 20 Cl.Ct. 400, 406–07 (1990) (on remand, finding that "authority to issue letters of guarantee was not an 'integral part' " of an SBA agent's duties and refusing to imply that authority); *Eliel,* 18 Cl.Ct. at 468 (finding plaintiffs failed to allege facts to show implied authority for FmHA administrators to release debtors from their agricultural loans).

5. In sorting out what authority Congress intended to delegate to the U.S. Attorneys incident to their power to prosecute, one might, for example, consider that Congress chose to give prosecutorial authority both to the Attorney General and to the U.S. Attorneys, while it gave the power over immigration matters to the Attorney General alone. It could also be relevant that the power to prosecute has been granted to U.S. Attorneys in one form or another since 1789, *see* Judiciary Act of 1789, ch. 20, sec. 35, 1 Stat. 73, 92 (1789), and in the intervening two centuries no one has suggested that it carries the implied authority to bind the United States in non-criminal matters related to the subject matter of a criminal prosecution.

to "very high officials" like the U.S. Attorney, maj. op. at 1341, but that condition does not make the majority's standard any more concrete. The cooperation agreement here was signed not by the U.S. Attorney personally, but by an AUSA, as is normally the case. *See* ER exh. 5, at 62. To be sure, the AUSA got his authority from the U.S. Attorney, but Congress always grants authority to the Attorney General, the Secretary of Commerce or some other high-level official, who in turn delegates it to a subordinate. Thus, the "very high officials" component of the majority's third prong adds little, if anything, to the majority's analysis; it either cuts against the majority's conclusion (because the cooperation agreement was not in fact signed by such a high level official), or is irrelevant (because it's always true).[6]

One need only ponder a few hypotheticals and try to predict how they would come out under the majority's analysis to appreciate how malleable that analysis is. Consider whether the U.S. Attorney's power to prosecute cases and to enter plea bargains entitles him to bind the DEA not to revoke a physician's license to sell prescription drugs if the physician pleads guilty to unlawfully distributing heroin, *see United States v. Fitzhugh,* 801 F.2d 1432, 1434 (D.C.Cir.1986); bind the Bureau of Prisons to release a prisoner on his earliest possible parole date in exchange for cooperation in the prosecution of a codefendant, *see Roe v. United States Attorney,* 618 F.2d 980, 982 (2d Cir.1980); or bind the U.S. Marshal's Service, in its administration of the Witness Protection Program, to provide twenty-four hour surveillance of a criminal defendant's home in exchange for his agreement to testify against a codefendant, *see Doe v. Civiletti,* 635 F.2d 88 (2d Cir.1980).

Conversely, could other government agencies bind the government, and thus the U.S. Attorney, not to bring certain criminal prosecutions? For instance, National Park Rangers are authorized to enforce federal law in national parks and recreation areas. Incident to this authority, could Park Rangers promise a drug dealer immunity from prose-

cution in exchange for information about poaching in a national park? *See United States v. Williams,* 780 F.2d 802, 803 (9th Cir.1986) ("In general, a promise made by a government employee other than the United States Attorney to recommend dismissal of an indictment cannot bind the United States Attorney."). Consider whether a similar promise would bind the U.S. Attorney not to prosecute if it were made by a law enforcement officer of the District of Columbia, *see United States v. Hudson,* 609 F.2d 1326, 1329 (9th Cir.1979); an FBI agent, *see United States v. Lombardozzi,* 467 F.2d 160, 162 (2d Cir.1972); a Customs agent, *see Howard,* 31 Fed.Cl. at 314; or an SEC enforcement officer, *see Dresser Indus. v. United States,* 596 F.2d 1231, 1236 (5th Cir.1979).

C. The majority suggests that its ruling will not pose any problems because the Attorney General can issue regulations limiting the authority of her subordinates. Taken at face value, this suggestion is puzzling. As I understand the majority's rationale, U.S. Attorneys derive their authority to bind the government in immigration matters directly from Congress as a concomitant of their statutory authority to conduct prosecutions. Assuming the majority is right and Congress did give U.S. Attorneys implied authority to bind the government in immigration matters, I don't see how the Attorney General can limit the scope of that authority, any more than she could limit the scope of any authority granted to an official directly by Congress. Could the Attorney General, for example, issue an internal procedure or regulation repealing the power of U.S. Attorneys to conduct prosecutions pursuant to 28 U.S.C. § 547?

In any event, I am aware of no support for the proposition that government officials must issue regulations *denying* that their subordinates are authorized to do certain things. The Attorney General could doubtless keep a small army of lawyers busy full time issuing regulations abjuring the implied authority the majority has potentially made available to scores of thousands of her subordinates. And she wouldn't be alone. Every

---

6. Whether an official will be high-level enough under the majority's analysis is, in any event, not easy to predict. Thus, the majority distinguishes *United States v. Williams,* 780 F.2d 802 (9th Cir.1986), on the ground that the official whose authority was at issue in that case was a mere Veterans' Administration personnel director, whom the majority relegates to the status of a

lower level government official. Maj. op. at 1341. Those of us who have graduated from law school think it self-evident that lawyers are far more important than non-lawyers. But I'm at a loss to find any objective reason why the VA official in *Williams* should be considered lowly while the AUSA here is big and important.

other cabinet secretary, every agency head, every board or regulatory body would have to figure out what a court might consider to be within the implied authority of each of its employees—what authority two circuit judges might find "no reason [to] ... doubt" the employees have—and then proceed to squelch it. Would the President have to issue regulations saying, for example, that Justice Department litigators cannot bind the U.S. Army Corps of Engineers? Would Congress have to load committee reports with lists of powers *not* implicitly delegated to various government officials? Even if this were possible, what's the point? Isn't it far simpler to stick with the assumption, adopted by every other court, that executive branch officials cannot bind the government outside the scope of their express authority?

\* \* \*

As Justice Frankfurter said in *Merrill,* "[t]he case no doubt presents phases of hardship." 332 U.S. at 383, 68 S.Ct. at 2. And I can well understand my colleagues' impulse to try to hold the government to the deal the AUSA made. But there's just no way to get from here to there, at least not without uprooting much established law and many commonly-held assumptions about how the government works. This is too high a price to pay for giving Mr. Thomas the benefit of his bargain. I respectfully dissent.

\* \* \*

In its petition for rehearing the United States cites an internal Justice Department manual which states that U.S. Attorneys may not bind the government on immigration matters without authorization from the Assistant Attorney General for the Criminal Division. Because the government was late in citing the manual, I would not consider it; nor, under my view of the matter, does the manual make any difference. But the majority's treatment of the manual does point out just how radically my colleagues depart from the prevailing caselaw. Not only does the Attorney General have to expressly deny that her various agents can bind the government as to matters outside the scope of their

actual authority, but the government then has the burden of proving that the agent in any given case has disobeyed that limitation. Maj. op. at 1340.[7]

The majority rests its analysis on a century-and-a-half-old Supreme Court case that has remained unmentioned in this circuit in more than 800 consecutive volumes of the Federal Reporter. Why, one wonders, did the representation of coverage made to poor Mr. Merrill by the local agents of the Federal Crop Insurance Corporation not "suffice [ ] as prima facie evidence of [the agents'] authority," shifting to the government "the burden of proof ... to show that [the agents] violated" the limitation on their authority? How different *Merrill* and hundreds of other cases would have come out if the courts there had said, "We shall not invent an excuse for the government to break its promise. If they have an excuse, let them prove it." *Id.* at 1343. The majority construes fifty years of caselaw standing on its head; I prefer to keep my feet firmly on the ground.

---

7. The majority refers to an affidavit by the agent as a means of proving he acted without authority, but that would only raise a disputed issue of fact. The opposing party would then be entitled to submit contrary evidence, which means that it

would probably be able to depose the agent and obtain other discovery regarding the exact nature and scope of his authority. *See* Fed.R.Civ.Proc. 56(f).